Chicago Title and Trust Company, Plaintiff, v. Arthur W. Guild, Appellee, and Thomas C. Hull and George L. Allmart, Appellants.

Gen. No. 10,050.

Opinion filed June 14, 1946. Rehearing denied October 3, 1946. Released for publication October 3, 1946.

RATHJE & WOODWARD, of ·Wheaton, for appellants; JOHN S. WOODWARD, of Wheaton, of counsel.

HADLEY & LEREN, of Wheaton, for appellee; ·CHARLES W. HADLEY, of Wheaton, of counsel.

MR. JUSTICE BRISTOW delivered the opinion of the court.

The Chicago Title and Trust Company, plaintiff in this proceeding, is seeking to pay a real estate commission to the proper person for having procured a purchaser for certain real estate known as the Kauff-, man Building, situated at 100 North Hale street in the

city of Wheaton, Illinois. This property was held by the plaintiff as trustee under Trust No. 31212. There are two brokers claiming the commission, namely, Arthur W. Guild, present appellee, and the partnership of Thomas C. Hull and George L. Allmart, appellants. We will refer to these contestants as Guild and Hull.

The plaintiff's complaint having been filed in the circuit court of DuPage county was in the nature of an interpleader, and sought to have these two gentlemen litigate the question as to who was entitled to the commission which was in the sum of $1,298.65. This sum was deposited with the circuit clerk of that county to be paid to the successful contestant. The sufficiency of this complaint was questioned, and, on appeal to this court, we determined in the case of *Chicago Title & Trust Co. v. Guild,* 323 Ill. App. 608, that the suit would lie, and pursuant thereto a trial was had without a jury, wherein it was determined that Guild was the procuring cause of said sale, and thus entitled to the commission. This appeal followed.

The important question for this court to determine is whether the finding of the trial judge was palpably erroneous or clearly against the manifest weight of the evidence. We will detail rather fully the evidence as adduced on the trial. Guild had been a real estate broker for a period of 15 years, doing business principally in the city of Wheaton. It so happened that he managed the property involved in this litigation. The trust company indicated to Guild that the owners of this property would consider an offer to purchase, and asked him to try to find a purchaser. They declined, however, to give Guild an exclusive right to sell the same, but invited him to bring in an offer which would be duly considered. It was in March 1940, that Guild was appointed manager of the building. In 1942, a Mr. Walker of the trust company

came out to inspect the Kauffman Building, and some major repairs that had been made on it, and on this occasion told Guild that they had received an offer of $20,000 which had been declined, but that he thought if an offer could be made of two or three thousand more, it would be acceptable. Guild endeavored to interest many people in and about Wheaton in this property.

In December 1942, Guild contacted Dr. John M. Davis, the ultimate purchaser, and sought to advise him of the availability of this property. Previously, Dr. Davis had told Guild that he wanted him to be on the lookout for some business property investments. So Guild left word with Dr. Albright, an assistant of Dr. Davis, for the latter to see him, which he did shortly thereafter. In this interview Guild told Davis of his conversation with Walker. He also told him that in his opinion $23,000 would buy the property, and that also in his opinion, such sum was less than the ground value; that a new heating plant had been installed; that the taxes were about $600 per year; and that the fuel costs were about $500 per year. He also told him what the income was; and that it did not require a full time janitor, the janitor hire for the previous year being $180. He further related what repairs had been made, and what the light bills were. Guild showed Davis a floor plan that he had prepared for the second floor which involved a certain change that would enhance the rental income. It was brought out in this discussion that in view of the total revenue and cost of operation, Davis would enjoy a return of 12 per cent on his investment if he could purchase the property at $23,000. He asked Davis to let him submit an offer for that amount, but Davis said that he wanted to think it over. Later Guild learned that Davis had sold his home on Geneva Road sometime in January 1943, and thinking that he might then be in a better position to buy, went to see him in

regard to selling him this property. On this occasion, Guild again went into detail outlining the various advantages of this investment. And Davis again declined to let Guild submit an offer.

In the month of February 1943, Guild was in the office of the trust company where he met a Mr. Corbin who told him that he thought it would take $25,000 to buy the property in question. Guild afterwards reported this conversation to Davis, and stated that he was quite sure that the property could not be purchased for $23,000, but that he would submit an offer for that if he would authorize him to do so.

On April 8, 1943, Guild received a letter from the trust company stating that they had received an acceptable offer for the purchase of the Kauffman Building. Thereafter, Guild went to their office and inquired of Corbin who the purchaser might be with the thought that he might arrange to continue on as the manager of the property. Mr. Corbin did not give him this information, but told him that the property was being sold through Hull's office. Shortly thereafter, Davis came to Guild's office, and at that time Guild told the doctor that the Kauffman property had been sold, and that he thought he had passed up a good deal. Davis then acting very nervously and sheepishly said he was the purchaser. This was Guild's first knowledge of such a fact.

Subsequently, Guild wrote the trust company asserting his claim to the commission, and Loy, the sales manager of the company, said he would withhold payment of the commission until the differences between Guild and Hull were ironed out. It might be observed here that the foregoing factual situation as outlined by Guild is practically undisputed.

Likewise, the testimony of Hull is essentially undisputed, and it runs as follows: Hull was a licensed real estate broker. On January 25, 1943, Dr. Davis called him at his home and asked him to come to his

office, which he did. While there, Hull learned that Davis was interested in various parcels of real estate. Davis told Hull that he would pay him for his services. They there discussed the wisdom of buying the Glen Ellyn State Bank Building, and they also considered the Kauffman property. Davis told Hull that he was interested in it, and that the owners would sell. Hull furthermore testified that when he talked to Davis, he inquired if he had discussed the property in question with any other real estate firm, and was told that he had talked with Guild five months previously, and was last told by Guild that the property was not on the market or was not available. Hull was told later by Mr. McKendry of the trust company that the trust committee was willing to accept an offer of $25,000. On the 26th of February 1943, Hull, for the first time, obtained from the trust company a listing of the Kauffman property. Hull and Davis had many meetings and discussions about the purchase of the Glen Ellyn property and the property in question, but the doctor seemed to be unable to make up his mind. On March 26, 1943, Hull told Davis that he had better hurry up and get his offer in for he knew of another offer of $25,000. He was then told by Davis that he was no longer interested in the deal. It then transpired that Dr. Davis proceeded to ignore Hull and almost immediately went all the way into Chicago by himself to the office of the trust company and executed a signed offer for $26,000. Hull upon hearing this fact called Davis and challenged his Machiavellian tactics, and thus got himself back into the picture. The sale was finally consummated at the figure of $26,225, and Hull signed the following guarantee: "The undersigned, a licensed real estate broker, represents that he is the only broker interested in the foregoing offer and agrees to indemnify and save the seller harmless from claims of any other broker in connection with said offer."

Davis was called as a court's witness, and was cross-examined by counsel for Guild and Hull. We deem it unnecessary to detail his testimony, but dispose of the same by saying that he was a most unsatisfactory witness. He had such a poor memory. It required much effort to extract the truth from him, but when it was finally obtained, it corresponded fairly well with what Guild and Hull had to say. We do not believe the doctor when he says that Guild told him that the property was no longer available, and we think Hull is relating the truth when he says that Davis told him that no other real estate firm was involved in this transaction. We are of the opinion that when Guild had completed his dealings with Davis, the doctor was definitely interested in the purchase of the property. There was no good reason for him to desert Guild and seek aid from Hull. Guild had managed the property and was very familiar with it. It is evident to us that Guild was the one who produced in the mind of Davis the desire and intention to buy this property. We do not believe he ever abandoned this desire. He says he was not interested, but his conduct belies this. Likewise, on March 26, he said he wasn't interested, but that was not true either.

Dr. Davis was shown other properties by Hull, and was told by Hull that the property in question was or might be unsound, and that there might be some difficulty in financing the deal as the trust company was demanding all cash. Counsel for Guild argue with some plausibility that the conduct of Hull appeared to be more in the capacity of a representative of Dr. Davis than a broker who expected a commission from the seller. Davis, in buying the property through Hull, places Guild in no different position than if Davis had gone directly to the trust company and closed the deal by himself.

The record indicates nothing of importance that Hull did to convince Davis that he should buy the Kauffman

Building. Guild had covered the ground thoroughly. There was nothing left for Guild to do except to submit an offer to the trust company. This certainly would have happened had it not been for the vulpine maneuvers of Davis. A situation quite analogous to the one under consideration appears in the case of *Francisco v. Coleman*, 230 Ill. App. 465, which is discussed in both briefs. There Francisco, a real estate broker, had found Lee, the ultimate purchaser, but for some unexplained reason Lee started negotiations with another real estate broker who closed the deal. Francisco brought suit for his commission, and the court in sustaining his right to prevail used this language which we consider quite pertinent: "There is no dispute about Lee having been first produced by the plaintiff and it cannot be seriously doubted that Lee never waivered in his intention to buy the land from the time he looked at it on December 9. It was not necessary for the trial judge to determine just what prompted Lee to endeavor to close the deal through someone else than the plaintiff. It is apparent that he had some purpose which seemed to be sufficient to him. His breaking off of negotiations with the plaintiff and taking them up with another brokerage firm was not the result of any decision on his part not to buy the land. The circumstances surrounding the transaction were such that the defendant Coleman ought to have known that his agent Francisco was not being fairly treated. Almost from the first he suspected that Stewart & Stockwell's customer was Lee. He was repeatedly admonished by the plaintiff that if the customer turned out to be Lee, he would be asked to pay plaintiff the commissions agreed upon. Coleman saw fit to let the matter drift and closed the deal through his new brokers without making any effort to protect his original agent, who was unquestionably the procuring cause of the sale. Under such circumstances the defendant cannot avoid the payment of the commissions agreed upon. (*Rigdon v. More*, 226 Ill. 382;

*Ogren v. Sundell*, 220 Ill. App. 584; *Hafner v. Herron*, 165 Ill. 242.)''

There are many cases cited in Guild's brief which have to do with the familiar situation where a broker interests another person in the purchase of his principal's property, and that person closes the deal with the owner secretly and independently of the agent. Our courts consistently hold that the agent can recover his commission. The only difference between those cases and the instant one is that Dr. Davis does not go directly to the trust company to close the deal, but enlists the assistance of a representative who knew nothing of the fact that the property in question was for sale, and of course had no listing of it by the owner. The fact that Guild did not go with Davis to the trust company, in itself, does not bar his recovering a commission.

In *Wright v. McClintock*, 136 Ill. App. 438, the appellee McClintock was a real estate broker at Hinsdale, Illinois, and one Mrs. Bush listed her property with him for sale. The appellant Wright was a lawyer and also dealt in real estate with offices in Chicago. McClintock showed Wright the property belonging to Mrs. Bush but no sale resulted. Wright then went direct to Mrs. Bush. McClintock then sued Wright for his commission, for during the course of negotiations Wright had written McClintock that he would protect him in his fees and this court said, page 441: ''Where an agent employed to sell property induces a party to go to his principal and a sale is effected to such party through his efforts or information derived from him, the agent is entitled to a commission, although he does not personally introduce the purchaser to his principal. Where an agent is employed to sell real estate for the owner or undertakes the employment and is instrumental in bringing the owner and the buyer together, and the owner then concludes the sale at a less price than the agent was authorized to sell, the agent is en-

titled to compensation for his services. *Wilson v. Mason*, 158 Ill. 304; *Hafner v. Herron*, 165 Ill. 242; *Henry v. Stewart*, 185 Ill. 448; *Rigdon v. More*, 226 Ill. 382.'' Hull seems to be the innocent victim of the subtle cunning of Davis and consequently should be paid by Davis.

■ ■ Many cases are cited in briefs of appellant and appellee on the question of whether the instant proceeding is one of law or one of chancery. Since the force and effect of the finding of the trial court in law and chancery cases where the court hears evidence without a jury is substantially the same, it makes very little difference whether we consider this case one in chancery or law. We believe the evidence clearly shows that Guild is entitled to the commission. Consequently, we affirm the trial court's conclusion.

*Judgment affirmed.*