Friedman Electric Company, Plaintiff-Appellee, v. St. Clair County Housing Authority of the City of East St. Louis, Defendants-Appellants.

Term No. 59–M–12.

Fourth District.

October 6, 1959.

Rehearing denied October 26, 1959.

Released for publication October 27, 1959.

16

Charles M. Whealon, of East St. Louis, for defendants-appellants.

Kramer, Campbell, Costello and Wiechert, of East St. Louis, and Lindauer, Lindauer, Pessin and Nieman, of Belleville, for plaintiff-appellee.

JUSTICE HOFFMAN delivered the opinion of the court.

This action was brought by the plaintiff for damages for breach of two contracts for the furnishing of electrical materials and labor by the plaintiff on three low-rent housing projects constructed for the defendant. The defendant counterclaimed for breach of the same contracts. The two contracts have the same terms and conditions and, by agreement of the parties, are considered as one contract for purposes of evidence and law. The action was tried by the court without a jury. After many months of intermittent hearings and

the introduction of volumes of evidence, the court found for the plaintiff on its complaint and against the defendant on its counterclaim. The defendant's main point upon appeal is that the judgment is against the manifest weight of the evidence.

On November 26, 1951 defendant entered into a contract with plaintiff to furnish labor and materials for electrical work on a project known as Project Ill. 1–3, which involved 38 buildings with 300 dwelling units. On January 21, 1952 the same parties entered into a similar contract on projects known as Projects Ill. 1–4 and Ill. 1–5, which involved 46 buildings with 300 dwelling units and 13 buildings with 100 dwelling units respectively. Orders by the defendant to plaintiff to proceed with the work were issued on December 18, 1951 and January 23, 1952. Plaintiff submitted progress schedules on each project on February 2, 1952. These project schedules were formulated by plaintiff, correlated to the progress schedules of the general contractor, and approved by defendant. They indicated when certain phases of the work were to be done.

Early in 1952 work was commenced at the aforesaid projects by the general contractor. However, by August of that year the defendant had become dissatisfied with the progress and work of the plaintiff, and on August 19, 1952 gave plaintiff a five day notice of contract termination. The contract between the plaintiff and defendant provided in part as follows:

"If the Contractor . . . should persistently or repeatedly refuse or fail to supply enough properly skilled workmen or proper materials . . . or persistently disregard instructions of the Local Authority or Architect . . . then the Local Authority may, by at least five days prior written notice to the Contractor . . . terminate the Contractor's right to proceed with the work. In such event, the Local Authority may

18

take over and prosecute the work to completion . . . and the Contractor and his sureties shall be liable to the Local Authority for any excess cost occasioned. . . ."

The contract further provided that:

"If the Contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in the Special Conditions, or any extension thereof, or fails to complete said work within such time, the Local Authority, may, by written notice to the Contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay. In such event the Local Authority may take over the work and prosecute the same to completion, by contract or otherwise and the Contractor and his sureties shall be liable to the Local Authority for any excess cost occasioned the Local Authority thereby."

Plaintiff's contention is that defendant wrongfully terminated the contract and thereby became liable to plaintiff for its loss of prospective profits. Defendant contends that the termination was proper, and that it is entitled to recover the excess costs occasioned.

██ We are mindful of the oft-stated rule which requires that we must affirm a trial court's finding if it is not contrary to the manifest weight of the evidence. But, we also recognize it to be our clear duty to carefully examine the record here, voluminous as it may be, to determine whether the evidence justifies the judgment. If, from a consideration of the whole record, it appears to us that the evidence does not justify the judgment, it is our plain duty to reverse. Sharkey v. Sisson, 310 Ill. 98, 114, 115; Daven v. Downey, 378 Ill. 543, 552, 39 N.E.2d 45, 49; Stephenson v. Kulichek, 410 Ill. 139, 147, 101 N.E.2d 542, 546. This obligation rests upon us irrespective of whether

the case is one at law or chancery. Chicago Title & Trust Co. v. Guild, 329 Ill. App. 374, 382, 68 N.E.2d 615, 618.

■ The burden was upon the plaintiff to prove, by a preponderance of the evidence, that the defendant, under the terms of the contract, improperly terminated plaintiff's right to proceed with the work. Plaintiff called two witnesses in this regard, its president, Victor Friedman, and a superintendent, William Rogers, who was hired by plaintiff 11 days prior to the contract's termination.

Friedman testified that his company had been in the electrical contracting business in the locality for many years, and had a vast experience in electrical contracting for the Federal Government, State of Illinois, and various schools and municipalities. He admitted that the electrical work on the projects in question did not begin on time but blamed this upon the late spring, heavy rains and slowness of the general contractor. He testified that there was no question of plaintiff's ability to complete its contract, for it had the finances, labor, materials and equipment necessary to do the job. He stated that on August 18, 1952, the day before the notice of termination, the work was moving along nicely on schedule and that he had plenty of men on hand.

Rogers, the superintendent, testified that he checked the progress of the jobs in early August; that he found the electrical employees and foreman qualified; that the work was in accordance with the specifications; and that nowhere was plaintiff holding up the progress of other crafts.

No other evidence was produced by plaintiff. Its case must rest, therefore, upon the testimony of its president and its superintendent of 11 days.

By contrast, the defendant produced numerous witnesses, the principal one being Charles A. Reid of

20

Colorado Springs, Colorado, who was the project engineer for the Public Housing Administration. Mr. Reid had been in the construction business since 1910, had owned his own company at one time, and had worked for the Public Housing Administration for ten years at the time he testified. He stated that he had been a manager of an engineering and contracting firm, had worked on numerous public buildings in Chicago, and had had numerous experiences with various public housing projects. At the time involved, he was project engineer for four or five other public housing projects and served in an advisory capacity to the defendant. As project engineer, his duties involved making construction reports every two weeks which reflected the progress on the job, the percentage of physical completion, and the percentage of completion according to the progress schedules which the contractors submitted prior to commencement of the work. These reports were governmental reports, submitted to the government only, not to plaintiff or defendant, and made by the witness personally through personal inspections and investigations.

Reid's testimony, based upon his aforesaid reports, may be summarized as follows: On May 10, 1952 plaintiff's progress schedule called for 17% completion on Project 1–3, but he had actually completed only 1%; on May 24th, the schedule called for completion of 19%, but plaintiff had only completed 1%; on June 7th, the schedule called for 22% completion, but plaintiff had still only completed 1%; on June 21st, the schedule called for a completion of 25%, but plaintiff had only actually completed 2%; on July 5th, the schedule called for 26%, but plaintiff only had 3% finished; on July 19th, the schedule called for 29% completion, but plaintiff had only done 5%; on August 2nd, the schedule stated 32%, plaintiff had finished 8%; on August 16th the schedule called for 35% com-

21

pletion and plaintiff had finished, actually, only 10%; and on August 29th, after the plaintiff had been taken off the job, the schedule called for 38%, but only 14% was completed. The witness testified to figures which showed that the percentages were almost identical for Projects 1–4 and 1–5. For instance, the schedule called for a completion of 23% on both of these projects on July 5th, but the plaintiff had only actually completed 2% and 3%, respectively on that date, and on August 29th, the schedule called for completion of 35% on both projects, but the plaintiff had only completed 12% and 10% respectively.

Reid further testified that his reports showed that the general contractor was on schedule, except where he was hampered by plaintiff's failure to provide sufficient electricians. The witness concluded his testimony by stating that plaintiff, from start to finish, did not maintain a sufficient number of electricians to keep the progress he had scheduled.

Joseph Musterman, the superintendent of the general contractor on the projects involved, testified that electrical conduit had to be laid in the concrete slab which rested on the foundation of the buildings, and that once the foundation was ready, the general superintendent could proceed no further until the conduit had been laid. Then, after the framing to support the second floor had been completed, the electrician had to install conduit in the framing before it could be covered. The superintendent stated that on the very first slab plaintiff was late in putting conduit in; that plaintiff never had enough men on the job; that this slowed the general contractor to the point where, at times, there were 8 or 10 buildings being held up by plaintiff. Musterman's testimony was corroborated both by the project engineer, Mr. Reid, and the plaintiff's president, Mr. Friedman. Mr. Reid tes-

tified that on March 15th, 10% of the foundations of Project 1–3 were ready. However, Friedman admitted plaintiff didn't start any work on this project until April 24th. On April 26th, it is interesting to note, the general contractor had 35% of his foundations in. With regard to Project 1–4, Reid testified that on April 26th, the general contractor had 24% of the foundations in, but Friedman admitted the plaintiff didn't get started on this project until the week ending May 1st. On Project 1–5, the general contractor had some foundations in as early as April 12th, but the plaintiff didn't get started there until May 27th, when at least 60% of the foundations were ready. This witness further testified on cross examination that after plaintiff was replaced by another electrical contractor, the work got done and there were no more delays.

Clarence Worthen, the architect's supervisor, testified that he visited the job daily and plaintiff never had the job properly manned to maintain the schedule necessary to keep the work going in accordance with the progress schedule and that from the time plaintiff started to work he was never up to schedule. He testified further that at one time the general contractor was faced with cutting his labor crew until the electrical work was brought up to schedule.

Thomas Blazier, the plastering contractor, testified that his work was held up by the plaintiff and on occasions they had to by-pass certain work. This was corroborated by a lather, who stated that at numerous times the lathing had to be held up because the electrical conduits were not in. An electrician for plaintiff testified that all the time they were working on the project the electrical crew was not up to schedule. One of plaintiff's foremen testified that he couldn't keep up to schedule because he did not have sufficient workmen.

23

Many other witnesses called by the defendant testified to specific delays caused by plaintiff and to the fact that the electrical work on the projects was behind schedule. Letters written by defendant's director, by the architect, the project engineer and the general contractor were introduced. These letters, some written as early as May, pointed out to plaintiff that he was falling behind schedule and requested him to hire more men so that the general contractor and others would not be delayed any further.

Finally, defendant introduced a letter written by plaintiff's president to the local union on July 9, 1952. This letter said, in part, as follows: "As you know our most critical shortage of electricians exists on the Federal Housing Projects, E. St. Louis, Illinois, and on these jobs we are Very Very far behind; in some instances the General Contractor has covered us up because we did not have the man power available to keep up with the rapid pace of the other crafts. We are seriously retarding the progress of the job." (Capitalization not ours).

To detail all the evidence heard by the trial judge in this case would lengthen this opinion immeasurably and would serve no useful purpose. It was plaintiff's burden to establish its compliance with the contract. Plaintiff's evidence of compliance with that part of the contract above quoted settles down to several bland statements by plaintiff's president that he had plenty of men and was never behind schedule, and the statement of plaintiff's superintendent of 11 days that plaintiff was not holding up the progress of other crafts. We do not treat so cavalierly the clear directive of the contract between these parties. Overwhelmingly set against plaintiff's evidence is the testimony of the defendant's witnesses, none of whom were shown by the record to have any partiality, and the very significant categoric admission contained in plaintiff's

24

president's letter of July 9th. Plaintiff never satisfactorily explained this letter nor its plain implications.

We have spent long hours studying the record here, and we cannot arrive at any other conclusion than that the plaintiff, on this whole record, clearly has not established by a preponderance of the evidence that the defendant wrongfully terminated the contract. We find, based upon our consideration of this whole record, that the trial court's finding in favor of plaintiff, and his judgment order based thereon, both on the complaint and counterclaim, are clearly against the manifest weight of the evidence and are not justified by the evidence. It is, therefore, our plain duty to reverse the entire judgment order and remand the cause for a new trial.

Judgment reversed and cause remanded.

SCHEINEMAN, P. J. and CULBERTSON, J., concur.