Paul O. Dittmar and Eugenie K. Dittmar, His Wife, Plaintiffs-Appellees, v. William S. Ahern, Michael Grady, Inc., a Corporation, and O'Laughlin Material Company, a Corporation, Defendants, and Silbrico Corporation, a Corporation, Defendant-Appellant.

Gen. No. 48,383.

First District, First Division.

September 17, 1962.

Rehearing denied October 4, 1962.

Murphy & Pearson (Eugene Dooner Murphy and Thomas J. O'Brien, of counsel), all of Chicago, for appellant.

Dale, Haffner & Grow (Brimson Grow and Mitchell J. Overgaard, of counsel), all of Chicago, for appellees; Michael J. Grace and Gerald M. Chapman, of Chicago, for appellee.

MR. PRESIDING JUSTICE BURMAN delivered the opinion of the court.

This action was commenced by the plaintiffs, Paul O. Dittmar and his wife, Eugenie K. Dittmar, owners of a newly constructed house in Evanston, Illinois, against a general contractor, a plastering subcontractor, the plastering supplier, and the manufacturer of the plastering materials used, to recover damages for the failure of the plaster. A nonjury trial resulted in a judgment against Silbrico Corporation, the manufac-

turer, in the amount of $14,043.51; all other parties were found not guilty. Silbrico appeals from that judgment and the Dittmars filed a cross appeal from that portion of the judgment order finding William S. Ahern, defendant, general contractor, and Michael Grady, Inc., defendant, plastering subcontractor, not guilty. No appeal was taken against the dismissal of O'Laughlin Material Co., defendant, plastering supplier.

On April 14, 1950, the Dittmars, as owners of the premises in Evanston, Illinois, contracted with Ahern for the construction of a residence at a cost of $36,894. Ahern subcontracted the plastering job to defendant Grady who purchased some of the materials used on this job from O'Laughlin, part of which was perlite, a lightweight aggregate manufactured by defendant, Silbrico, and sold by it under the trade name of "Ryolex." The house was turned over to the plaintiffs for occupancy on April 20, 1951. Later the plaster on the walls and ceilings cracked and upon the failure of Ahern and Grady to correct the condition and after numerous complaints were made and the defects not remedied, plaintiffs employed another general contractor, who determined that the plaster throughout had failed and subsequently in April, 1954, substantially all of it was removed and the job replastered. On June 30th, 1954, plaintiffs filed suit against the four named defendants for damages.

Paragraph seven of the complaint against Silbrico charged that:

> . . . the mixing and manufacturing instructions furnished by [Silbrico] were improper and incorrect so that the plaster in plaintiffs' said residence did not properly adhere when made with the product manufactured and sold by said defendant Silbrico Corporation, and mixed and proportioned according to defendant's instruc-

170

tions, but cracked, blistered, peeled, crumbled and became delaminated and otherwise became defective and dangerous and failed to provide a useful and satisfactory wall surface.

The complaint against Ahern, which included the construction agreement, the general conditions of the contract and supplementary general conditions (specifications), charged that Ahern:

> . . . did not faithfully keep and perform [the construction agreement] but, on the contrary, failed to comply with manufacturer's directions as to proportioning and mixing the plaster ingredients and the plastered walls and ceilings were faulty, defective, wholly unsatisfactory and not in accordance with the provisions of the contract and the warranties and guarantees therein . . .

The complaint against Grady, after reciting that Grady had entered into an agreement with Ahern to do the lathing and plastering pursuant to the construction agreement, general conditions and specifications, charged Grady with the following acts of negligence:

> (a) Carelessly, negligently and improperly mixed and proportioned the various ingredients of the plaster to be applied to the walls and ceilings of plaintiffs' residence,
>
> (b) Carelessly, negligently and improperly failed to follow manufacturer's directions as to the mixing and proportioning of the plaster ingredients,
>
> (c) Applied said plaster to the walls and ceilings of plaintiffs' said residence in a careless, negligent and unworkmanlike manner.

The plastering done in the Dittmar residence was three coat plaster which consists of a base or scratch

171

coat, a brown coat (actually a second base coat) and a finish coat. Each coat is applied separately, after the prior coat has hardened. An aggregate is an essential ingredient of plaster. The three available were sand, vermiculite or perlite. Vermiculite and perlite being much lighter than sand are referred to as lightweight aggregates. When sand is used as an aggregate the plaster must be mixed outdoors, whereas lightweight aggregates, sold in bags and easy to handle, allow the mixing to be done indoors. Since the Dittmar residence was to be plastered in the winter, a lightweight aggregate was used to eliminate the risk of having the plaster freeze after it has been mixed. As the plaster sets and the moisture evaporates, stresses develop.

The Dittmars urge that the judgment be affirmed against Silbrico on the grounds that Silbrico failed to provide clear understandable instructions for the use of Ryolex; that Silbrico knew or should have known of the inherent danger of its product and was negligent in failing to give an adequate warning of the danger and that Silbrico was negligent in failing to use reasonable care in testing its product. In addition, they urge reversal for the judgment for Ahern and Grady on the grounds that they were negligent in not following Silbrico's instructions, and that they were guilty of a breach of express warranty.

At the outset we are confronted with the question of liability on the part of defendant, Silbrico. This defendant contends that there is no privity or contractual relations between the parties and that there is no liability for the negligent manufacture of its product in the absence of proof that it was inherently dangerous or would become so if negligently made or that Silbrico made fraudulent statements or misrepresentations.

■ ■ In Illinois the general rule is that the manufacturers are not liable in damages to persons with whom there is no privity or contractual relations for property damages sustained by such persons because of the negligent manufacture of the former's product. Rotche v. Buick Motor Co., 358 Ill 507, 193 NE 529; Day v. Barber-Colman Co., 10 Ill App2d 494, 135 NE2d 231. The parties do not dispute that this is the Illinois Rule.

There are three recognized exceptions to this rule:

1. Negligence of a manufacturer with reference to some article imminently dangerous to life or health of humankind.
2. An owner's act of negligence with reference to appliance which causes injury to one invited upon owner's premises.
3. When one without giving notice of its qualities, sells or delivers an article which he knows to be inherently or imminently dangerous to life or limb. Beadles v. Servel Inc. & Union Gas & Elec. Co., 344 Ill App 133, 140, 100 NE2d 405.

■ Plaintiffs assert that Ryolex is an inherently dangerous product and thus is outside the no privity rule. In their argument they rely on Beadles v. Servel Inc. & Union Gas & Electric Co., 344 Ill App 133, 100 NE2d 405. That case involved an action for personal injuries sustained when plaintiffs were overcome by gas produced by defendant's refrigerator. At trial the complaint was struck and the plaintiffs appealed from the dismissal of the suit. One count in the complaint alleged that the refrigerator required the burning of a gas flame to assist in the refrigeration process, and that the mechanism designed to provide the flame was designed and constructed in such a manner as to permit the deposit of carbon in proximity to the flame thereby restricting the air supply with the

173

result that all the gas was not burned. A second count alleged that in ordinary operation of the refrigerator a large amount of gas is given off and defendant failed to warn the purchasing public of this danger. In essence, the complaint charged that the refrigerator was faulty in design and construction, thereby creating a hazard for purchasers when put to its ordinary and intended use. The dismissal of the complaint was reversed on appeal. The court at page 143 stated the test to be, "is the appliance as defectively made inherently dangerous when put to its intended use?" Plaintiffs in the case at bar contend that Ryolex's ordinary and intended use is as an aggregate in plaster and that the plaster failure in their home is the direct result of that use. We cannot agree. The plaster failure was not proven to be the result of any inherent defect in Ryolex. Rather, the evidence clearly shows the failure was the result of improperly using Ryolex.

■ A blue brochure put out by Silbrico at the time the Dittmar residence was being constructed gave directions for using Ryolex. The brochure provided:

> GENERAL DIRECTIONS FOR MIXING RYOLEX PLASTER All Ryolex Aggregates shall be sized to suit the purpose for its application. Use Ryolex #2 for scratch and brown coats and Ryolex #3 for finish coats. For scratch and brown coat mix gypsum and water and then add slowly Ryolex #2. A mix of 1 bag of gypsum to 1 bag of Ryolex requires about 11 gallons of water. If mortar is too stiff add water to soften, if too wet add Ryolex to stiffen. 1 BAG RYOLEX EQUALS 4 CUBIC FEET.

Below this were two columns entitled "RYOLEX PLASTER MIXES." In the first column directions were given for mixing the base coats. For rock lath

174

plaster (used in the Dittmar residence) the scratch coat was to have one to one and one-half bag gypsum to each bag of Ryolex. For the brown coat the prescribed ratio was one bag gypsum to one bag Ryolex. In the second column were the directions for the finish coat. It prescribed use of one bag Ryolex with fifteen bags of lime. Grady and his plasterers testified that the scratch and brown coats were mixed according to the instructions on the Ryolex bags (which were identical to the instructions in the brochure). Grady, however, testified no Ryolex was used in the finish coat. This testimony is not contradicted. There is no evidence that the plaster would have failed if Ryolex #3 had been used in the finish coat. Thus, it is evident that the failure was not due to any inherent defect in the manufacture of Ryolex. Nor was the failure caused by Ryolex in its ordinary use. Its ordinary use includes use of Ryolex #3 in the finish coat. This was not done. The failure did not result from Ryolex being put to its intended use so that it cannot fall within the scope of the rule set forth in the Beadles decision.

■ It is plaintiffs' contention, however, that the directions were not clear or understandable. They say when sand is used as an aggregate in the two base coats it is not necessary to use an aggregate in the finish coat. Plaintiffs insist that Silbrico's instructions were inadequate in that they did not say Ryolex must be used in finish coat. To support their argument they cite language appearing on the outer cover of the brochure. "Replaces sand as an aggregate in plaster and in insulating concrete." Since the practice in the trade at that time was not to use any sand in the finish coat, plaintiffs contend a reader of the brochure would come to the conclusion that he need not use Ryolex in the finish coat. A like argument was made in Bender v. William Cooper & Nephews, Inc., 323 Ill App 96, 55 NE2d 94. A woman sued for eye

injuries sustained while using defendant's disinfectant. In support of her claim she relied on some of the language on the label of the disinfectant. The court pointed out that:

> The weakness of plaintiff's case is that she takes from the label a few words and bases her claim upon these words, ignoring all other statements on the label. . . . It will be noted that the words upon which plaintiff relies are not set out in large or bold face type nor in a manner that would call special attention to them. 323 Ill App 96 at 101–102.

The words plaintiffs rely on here do not appear in bold face type and are not set out in a manner which would call special attention to them. The sentence is preceded by one other sentence and followed by four more. The size of the type is no larger than the type explaining the general directions for mixing Ryolex plaster. In Bender the court also pointed out that the plaintiff was a well educated woman capable of understanding all the instructions given on the label. Here, the user of Silbrico's product was a plasterer with over forty years experience.

Grady testified that he read the instructions on the Ryolex bags and that these instructions were the same as those appearing in the brochure. According to his testimony this was the first time he used a lightweight aggregate. He also testified he was familiar with the specifications. (In addition, his answer to the complaint admitted that his agreement with Ahern was to do the plastering pursuant to the specifications). The specifications stated the plaster was to be "put on according to manufacturer's directions best three coat work." He admitted he read the blue brochure, yet the directions were not followed for he stated no Ryolex #3 was used in the finish coat. John Boland,

a journeyman plasterer for over ten years, was called as a witness by Grady. He testified that it is not good practice to follow manufacturer's specifications unless they are followed completely. Further he testified "[d]irections of an aggregate manufacturer must be followed even though contrary to proper practices." When a manufacturer provides instructions for the use of his product, and these instructions are deliberately not followed, we cannot see how the manufacturer can be held liable for damages on the grounds he did not provide proper instructions.

■ Grady introduced into evidence, over Silbrico's objections, what is described as a red brochure. This brochure was not published until after the Dittmar residence was constructed. It changed the mix for base coats and eliminated the need for Ryolex #3 in the finish coat. It was error to admit this in evidence.

> It is, of course, well settled that the question of the defendant's alleged negligence must be determined only by what occurred before and at the time of the incident, under then existing circumstances, and any evidence, if there were any, of alleged changes or repairs made afterwards was not admissible. Day v. Barber-Colman Co., 10 Ill App2d 494, 508.

■ Grady contends we must affirm a trial court's finding unless it is contrary to the manifest weight of the evidence. Boviard Supply Co. v. McClement, 32 Ill App2d 224, 177 NE2d 430. In making such a determination, however, the entire record must be reviewed and if it does not justify the verdict then it must be reversed. Stephenson v. Kulichek, 410 Ill 139, 101 NE2d 542; Friedman Elec. Co. v. St. Clair County Housing Authority, 23 Ill App2d 16, 161 NE 2d 473.

■ The evidence here indicates, without contradiction, that the cause of the plaster failure was the

177

failure to use Ryolex #3 in the finish coat. Grady admits he read the brochure which recited the mixing instructions including use of Ryolex #3 in the finish coat. Also available to Grady were the instructions put out by the gypsum manufacturers. Grady's estimator, Raymond Schmidt, ordered the materials from O'Laughlin for the Dittmar job. When asked why he didn't order Ryolex number three he replied, "because Ryolex number three never came into the picture. The only perlite we were told to use was to be used in place of sand which was a lightweight aggregate for the sand. Q. Who told you that? A. Mr. Grady." It thus became apparent that Grady never intended to use Ryolex number three from the very beginning. It is obviously evident from the evidence that Grady, although using perlite for the first time, did not follow any manufacturer's instructions, but merely mixed the plaster on his own stating: "[i]t is not normally good plastering to follow manufacturer's directions completely when you handle a new product that you never handled before." In supporting his decision not to use Ryolex in the finish coat Grady testified that, "Ryolex is used for one purpose, instead of sand in the base coat for plastering. It wasn't meant for anything else . . ." Since he never used sand in the finish coat (except that, occasionally, a scoop or two was used), no Ryolex was used. No support for this conclusion is offered unless reliance is placed on the one sentence on the outside of the brochure describing Ryolex as a replacement for sand. This one sentence does not support Grady's conclusion when he admits reading the whole brochure and the directions call for use of Ryolex #3 in the finish coat. Two methods of mixing the plaster were available to Grady. Either would have furnished a satisfactory job. Grady chose to follow neither.

The defendant Ahern, the general contractor, guaranteed the plastering job for two years. A portion of his contract recites:

The Contractor agrees that he is as fully responsible to the Owner for the acts and omissions of his subcontractors and of persons either directly or indirectly employed by them, as he is for the acts and omissions of persons directly employed by him. Article 36 of the General Conditions of the Contract.

Guarantee: The Contractor shall guarantee the adhesion of the plaster on the surfaces, for a period of eighteen (18) months, from the date of completion and acceptance of the building, and shall make good any damage done to the building or contents through falling of plaster. All plastering shall be otherwise guaranteed for two (2) years from date of completion and acceptance of the building, including guarantee against popping, peeling or other defects. Paragraph 4–09 of the Supplementary General Conditions.

Material for Plastering: Plaster shall be Red Top as manufactured by U. S. Gypsum Company, a gypsum plaster complying with the provisions of the standard specifications of gypsum plaster or the American Society for Testing Materials and shall be put on according to manufacturer's directions best three coat work. Paragraph 4–15 of the Supplementary General Conditions.

The plaster failed within the two year period. Ahern rested without putting in any evidence and without filing a brief in this appeal. The evidence shows Ahern actively participated in the plastering job. It is uncontradicted that it was Ahern who in-

179

structed Grady to use a lightweight aggregate instead of sand and he directed Grady to mix it in the garage so it wouldn't freeze. Furthermore Grady testified that Ahern failed to tell him that there were metal laths on the ceilings of the living and dining room. Metal ceilings according to Grady "called for more stuff." The mix he used on the ceilings was based on rock lath and he said this mix "for metal lath would be poor." We conclude that both Ahern and Grady were negligent in failing to follow the instructions of Silbrico and this negligence was the proximate cause of the plaster failure.

For the reasons stated the judgment of the trial court against Silbrico Corporation is reversed. The judgment of not guilty entered as to Ahern and Grady is also reversed, and as no point was urged by these defendants, as to the amount of damages awarded to the plaintiffs, the cause is remanded to the Superior Court with directions to enter judgment against William S. Ahern and Michael Grady, Inc., a corporation, in the amount of $14,043.51.

Reversed and remanded with directions.

MURPHY and ENGLISH, JJ., concur.