James Williams, Plaintiff-Appellee, v. Brown Manufacturing Company, Inc., a Corporation, Defendant-Appellant, Illinois Power Company, Defendant.

Brown Manufacturing Company, Inc., a Corporation, Third Party Plaintiff-Appellant, v. Somerville-Illinois Company, a Corporation, Third Party Defendant-Appellee.

Gen. No. 67–58.

Fifth District.

March 27, 1968.

335

Martin J. Corbell, Sonnemann & Corbell, of Vandalia, and Gordon Burroughs, Burroughs, Simpson & Burroughs, of Edwardsville, for appellant.

William W. Schooley, Beatty, Schooley and Theis, of Granite City, for appellee.

GOLDENHERSH, J.

Defendant, Brown Manufacturing Company, Inc., appeals from the judgment of the Circuit Court of Madison County entered upon a jury verdict in the amount of $40,000.

In his fourth amended complaint plaintiff alleges that defendant was a manufacturer of trenching machines, that plaintiff, in the course of his employment by Somerville-Illinois Company, was operating a trencher manufactured by defendant, that the machine bucked, jumped a number of feet to the rear, knocking plaintiff to the ground and running over him, causing him to suffer serious injuries. Plaintiff alleges that the injuries were suffered as the direct and proximate result of "an unreasonably dangerous condition" of the trencher, and the condition existed at the time the trencher left the control of the defendant. Plaintiff alleges further that the trencher was in an unreasonably dangerous condition when it left the control of defendant in one or more of several respects which will be later enumerated and discussed.

Defendant answered, denying the material allegations of the complaint, and asserted as "affirmative defenses," (a) that the action was barred by the provisions of chapter 83, sections 13 and 15, Ill Rev Stats, and (b) the plaintiff had "assumed all risk in relation to use and operation" of the trencher. Defendant filed a Third-Party Complaint directed against plaintiff's employer, Somerville-Illinois Company, alleging that any "injury to plaintiff, if any, was proximately, primarily and actively

340

caused by negligence of Somerville-Illinois Company" and praying judgment indemnifying defendant against any judgment rendered against it in plaintiff's action.

Somerville-Illinois, and plaintiff, filed separate motions for severance of the third-party action, the motions were allowed and the cause proceeded to trial.

Defendant has briefed and argued numerous grounds for reversal. The first assignment of error to be considered is that the trial court erred in denying defendant's motion for a change of venue from Madison to Bond County.

Illinois Power Company was named as a party defendant in plaintiff's original complaint. The occurrence out of which the suit arises took place in Bond County. Defendant filed a motion for change of venue, supported by affidavit of counsel, alleging that venue exists, if at all, in Bond County, that defendant, Illinois Power Company, was joined solely for the purpose of fixing venue in Madison County, and not in good faith, nor with the expectation of obtaining judgment against Illinois Power Company, that Illinois Power Company would be dismissed at close of plaintiff's case and such dismissal would be highly prejudicial to defendant. As predicted by defendant, at the close of plaintiff's case the court allowed the motion of Illinois Power Company for a directed verdict.

A review of the record shows that defendant, in a special and limited appearance supported by affidavit, alleges it is an Iowa corporation, not authorized to transact business in Illinois. Section 6(1) of the Civil Practice Act (c 110, § 6(1), Ill Rev Stats 1965) provides in part— "A foreign corporation not authorized to transact business in this State is a nonresident of this State." Section 5 of the Civil Practice Act provides that if all defendants are nonresidents of Illinois, an action may be commenced in any county.

■ Nothing in this record supports defendant's contention that the joinder of Illinois Power Company as a defendant was not in good faith. Assuming, arguendo, that such joinder was not in good faith, defendant, as a foreign corporation not authorized to do business in Illinois, could properly be sued in any county, and the trial court did not err in its denial of the motion for change of venue.

We shall next consider defendant's contention that the trial court erred in allowing the motions of plaintiff and third-party defendant for severance of the third-party action.

Defendant argues that it has been put to substantial expense in the defense of plaintiff's action, and if defendant is ultimately held liable, it will be put to additional expense in pursuing its action for indemnity. It contends that it was entitled to have the issues of its liability and its right to indemnity determined in a single trial. It argues further that it was deprived of certain tactical trial advantages in presentation of evidence, and would have been entitled to benefits of "automatic discovery not otherwise available to defendant."

As to the latter contention defendant has not pointed out, nor does this court perceive, in what manner its discovery was limited by the order of severance.

Whether, and under what circumstances, a trial court should order severance of third-party actions, has presented a difficult issue to both our trial and reviewing courts. The complexity of the problem is pointed up in the excellent summaries prepared by Judge Hallett and Professor Vitullo (Report of The Twelfth Annual Illinois Judicial Conference 1965 pp 88–89) and an excellent and comprehensive article in the Summer edition of the Law Forum (Feirich—Third Party Practice, Summer Volume 1967, page 236, 1. c. 268, The University of Illinois Law Forum).

■ ■ Upon reviewing the authorities, we conclude that a motion to sever a third-party action, like other motions to sever, is addressed to the sound discretion of the trial court, Mount v. Dusing, 414 Ill 361, 111 NE2d 502, and the trial court's ruling should not be disturbed unless a reviewing court can say that the trial court abused its discretion. Johnson v. Johnson, 5 Ill App2d 453, 125 NE2d 843.

■ This action was pleaded and tried on a theory of strict liability in tort (Suvada v. White Motor Co., 32 Ill2d 612, 210 NE2d 182), and under this theory plaintiff was not required to prove negligence. Defendant's third-party complaint charges the third-party defendant with a number of acts of negligence and examination of the pleadings shows that trial of the third-party action along with the principal suit might well have presented many problems. The number of points briefed and argued by the parties demonstrates the complexity of the trial of the issues in the principal cause of action. Defendant has not demonstrated that the order of severance prejudiced any of its "substantial rights," and from our review of the record we cannot say that the trial court abused its discretion.

Defendant contends that the trial court erred in denying its motion for directed verdict based upon its affirmative defense that plaintiff's cause of action was barred by the provisions of chapter 83, sections 13 and 15, Ill Rev Stats. Plaintiff's original complaint was filed May 10, 1963, alleging injuries as the result of an occurrence on May 19, 1961. At the close of all the evidence, prior to submission of the case to the jury, the parties stipulated that the evidence shows that the trencher was designed, manufactured, sold and out of the control and possession of the manufacturer more than 2 years before the complaint was filed. Defendant moved for directed verdict, and the motion was denied.

343

■ Neither party has cited, nor has this court found, an opinion of an Illinois court of review in which the precise issue presented here is decided or discussed. Counsel have cited numerous authorities in support of their contentions including 4 ALR3d 821, wherein many cases are gathered and discussed. The pattern which evolves from a review of the cases is that a distinction is made between causes of action which arise from a breach of warranty and those which are the result of a sudden trauma and sound in tort. Illinois has followed the rule that when the cause of action accrues as the result of a sudden trauma and is in tort, the statute of limitations runs from the day on which the *injury* is done. *Gray v. American Radiator & Standard Sanitary Corp.*, 22 Ill2d 432, 176 NE2d 761.

■■ The doctrine of strict liability in tort, as enunciated in Suvada, does not depend upon either negligence or warranty as the basis for liability. The action is in tort and it appears to us that the same rule should apply in this type of tort as would be applicable in an action in tort based upon negligence. In *Gray v. American Radiator & Standard Sanitary Corp.* (supra) the Supreme Court said, at page 435: "The wrong in the case at bar did not originate in the conduct of a servant physically present here, but arose instead from acts performed at the place of manufacture. Only the consequences occurred in Illinois. It is well established, however, that in law the place of a wrong is where the last event takes place which is necessary to render the actor liable. (Restatement, Conflict of Laws, sec 377.) A second indication that the place of injury is the determining factor is found in rules governing the time within which an action must be brought. In applying statutes of limitation our court has computed the period from the time when the injury is done. (*Madison v. Wedron Silica Co.*, 352 Ill 60; *Leroy v. City of Springfield*, 81 Ill 114.) We think it is clear that the alleged negligence in manufacturing the valve cannot be separated from the resulting injury;

344

and that for present purposes, like those of liability and limitations, the tort was committed in Illinois." We fail to see any reason to apply a different rule in this case, and the holdings in Mosby v. Michael Reese Hospital, 49 Ill App2d 336, 190 NE2d 633 and Seymour v. Union News Co., 349 Ill App 197, 110 NE2d 475, do not support defendant's contention that the rule is to the contrary. The trial court did not err in denying the motion for directed verdict based on the affirmative defense of limitations.

Defendant contends that the trial court erred in denying its successive motions to dismiss, for directed verdict, and for post-trial relief, all of which were based on the ground that the plaintiff had failed to state or prove a cause of action because of his failure to allege or prove that he was in the exercise of due care for his own safety. Plaintiff argues that in a strict liability case, contributory negligence, or the failure to exercise due care, is an affirmative defense. The court directed a verdict for the plaintiff on the issue, and since the discussion of defendant's contentions arising from that ruling requires a review of the evidence we shall at this time consider only the question of whether plaintiff was required to plead freedom from contributory negligence, or that he was in the exercise of due care.

In its opinion in Suvada, our Supreme Court adopted the doctrine of strict liability in tort and in so doing stated at page 621: "We note that the views herein expressed coincide with the position taken in section 402A of the American Law Institute's revised Restatement of the Law of Torts approved in May 1964."

The Supreme Court did not express an intent to modify the doctrine as stated and defined in the Restatement, and we conclude therefore that implicit in the doctrine as adopted is the rule with respect to contributory negligence as set forth in note (n) to section 402A of the Restatement:

345

"n. Contributory negligence. Since the liability with which this Section deals is not based upon negligence of the seller, but is strict liability, the rule applied to strict liability cases (see § 524) applies. Contributory negligence of the plaintiff is not a defense when such negligence consists merely in a failure to discover the defect in the product, or to guard against the possibility of its existence. On the other hand the form of contributory negligence which consists in voluntarily and unreasonably proceeding to encounter a known danger, and commonly passes under the name of assumption of risk, is a defense under this Section as in other cases of strict liability. If the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it, he is barred from recovery."

This brings us to the question of whether certain language in People ex rel. General Motors Corp. v. Bua, 37 Ill2d 180, 226 NE2d 6, serves to modify the rule as defined in the Restatement. In Bua, the Supreme Court at page 196 said: "This is a products liability case pleaded in two counts, one alleging negligence, and the other alleging breach of warranty. In Suvada v. White, 32 Ill2d 612, this court adopted the theory which imposes strict tort liability on the manufacturer. Under that theory, negligence need not be proved and a plaintiff has only to prove that his injury or damages resulted from a condition of the product, that the condition was an unusually dangerous one, and that the condition existed at the time the product left the manufacturer's control. However, under both counts it is necessary to prove that the plaintiff was in the exercise of due care for his own safety." At page 197, the court said: "In a products liability case the objects of discovery on the part of a plaintiff against the manufacturer could not relate either to the issue of damages, or to the issue of the plaintiffs' freedom from contributory negligence."

346

■ Although defendant, in part, relies upon Bua in support of its contentions, counsel for both parties, and obviously for different reasons, argue that the above statements with regard to the exercise of due care and freedom from contributory negligence are dicta. We do not agree. The language is used to define and circumscribe the issues upon which the defendant's pleadings in that case should not have been stricken, and therefore, the statements are not dicta. The opinion does not, however, purport to decide the precise issues presented here, namely, the nature of the contributory negligence which would serve to bar plaintiff's recovery, nor upon whom falls the burden of pleading and proof. Our Supreme Court has repeatedly held that a judicial opinion is authority only for what is actually decided, Gannon v. Chicago, M., St. P. & P. Ry. Co., 22 Ill2d 305, 175 NE2d 785; Village of Lombard v. Illinois Bell Telephone Co., 405 Ill 209, 90 NE2d 105, and we construe Bua to decide that contributory negligence is properly an issue in a case based on strict liability, but do not construe the opinion to be decisive of the specific issues here presented.

■ Because of the conclusions reached as to the intent of Suvada, and the limited purpose of the statements in Bua, we hold that in this action, based upon strict liability in tort, the trial court correctly held contributory negligence to be an affirmative defense. For the purposes of this opinion contributory negligence is defined as voluntarily and unreasonably proceeding to encounter a known danger or proceeding unreasonably to make use of a product after discovery of a defect and becoming aware of the danger. This definition does not purport to be all-inclusive, and we do not here speculate as to what modifications may stem from fact situations not here presented. In determining the issue of contributory negligence, the conduct of the plaintiff is not to be measured against the objective standard of conduct of a reasonably careful person, but is to be determined by

347

the subjective test of whether the particular plaintiff has proceeded unreasonably to use the product after he has discovered the defect and become aware of the danger, or has voluntarily and unreasonably proceeded to encounter a known danger.

Upon examination of the authorities, the justice and rationale of placing the burden of pleading and proof of contributory fault on the defendant, become readily apparent.

A manufacturer is held to the degree of knowledge of experts. ". . . the duty contemplated by the court in Suvada is one of making the chattel safe for the use for which it is supplied," Dunham v. Vaughan & Bushnell Mfg. Co., 86 NE2d 315, 229 NE2d 684. The question of what is ordinary or foreseeable use is one of fact, Hardman v. Helene Curtis Industries, Inc., 48 Ill App2d 42, 198 NE2d 681. Charged with the duty of making the product safe for the foreseeable use to which it might be put, and armed with expert knowledge, the manufacturer should bear the burden of proving that improper, abnormal or unforeseeable use of the product contributed to cause the injury. It appears unjust and incongruous to place the burden of proof of freedom from contributory fault upon a user, entitled to rely upon the product's being fit for its intended use, and not charged with expert knowledge. In our opinion the same reasoning which justifies the doctrine of strict liability compels the adoption of the rule that when a plaintiff proves that his injury or damage resulted from a condition of the product, that the condition was an unreasonably dangerous one, and that the condition existed at the time it left the manufacturer's control, (Suvada) the manufacturer must bear the burden of proof that the injury resulted from conduct of the plaintiff which contributed to cause his injury.

An analysis of the doctrine and the purposes to be achieved by its adoption compel us to conclude that the

test of contributory fault must be subjective, and not objective. As stated in Dunham, the doctrine imposes upon the manufacturer the duty of making the chattel safe for the use for which it is supplied. Once a defect is proved, as stated by the United States District Court for the Northern District of Indiana in Greeno v. Clark Equipment Co., 237 F Supp 427, at page 431, ". . . it seems unconscionable that the seller should by disclaimers avoid the duty of selling merchantable products or shift the risk of defect, unless the total circumstances of the transaction indicate the buyer's awareness of defects or acceptance of risk." The circumstances out of which Hardman v. Helene Curtis Industries, Inc. (supra) arose demonstrate that the knowledge, experience and ability of foreseeable users may vary greatly, and a product which might be used safely by one individual may prove lethal in the hands of another. To paraphrase the language of Greeno, contributory fault should not bar recovery, unless the total circumstances show the plaintiff has proceeded unreasonably to use the product after discovery of the defect and becoming aware of the danger. For the reasons set forth we hold that the trial court did not err in denying defendant's motions.

A review of defendant's remaining contentions requires a review of the evidence. The record shows that on May 19, 1961, plaintiff was 33 years of age and had been a journeyman operating engineer for approximately 4 years. He had operated all types of construction equipment ranging from small water pumps to large cranes.

The trencher which plaintiff was operating at the time of his alleged injury was a Bus Brown Trencher 468R Model. It was one of four new machines delivered to plaintiff's employer, Somerville-Illinois, earlier in May. The trenchers were delivered in crates, and at the time of delivery the crates were intact, the trenchers were not damaged and no parts were missing. Plaintiff's father, James Williams, Sr., who was employed as Som-

349

erville-Illinois' master mechanic uncrated and assembled the trenchers. Assembly of each machine consisted of putting on the boom, rubber-tired wheels, digging chains and the handlebars. A pamphlet consisting of 7 pages and bearing on its cover the legend "Information on Bus Brown Trenchers" and the name of defendant was packed in each crate. The pamphlet contains one page of operating and maintenance instructions, divided into paragraphs headed "Getting the New Machine Ready to Trench," "Forward Travel," "Starting to Trench," "Adjustments and Maintenance," and "Suggestions for Safety." A second page is headed "Service and Maintenance Tips on Bus Brown Trenchers" subdivided into 8 paragraphs.

The portions of the manual which are pertinent here are:

## ADJUSTMENTS AND MAINTENANCE

"The engine is bolted stationary to the machine, and when the drive belts become loose enough to slip, adjust them by the threaded shaft on the right hand clutch lever. Caution—do not adjust the belts too tight; they must be able to slip under shock load."

"Service and Maintenance Tips on Bus Brown Trenchers."

"Short Belt Life: Belts that are adjusted too tight may turn sideways, also not be able to slip under shockload."

"Shearing Woodruff Keys . . . . . . Possible Cause and Remedy."

"Generally the drive belts are adjusted too tight, especially on the model 468R, the drive belts must be adjusted so they do not slip under normal trenching, but should be loose enough to slip when some object

350

gets caught in the digging chain, if the belts cannot slip, there is no protection against sudden shock."

"Suggestions for Safety: Always stop the engine before adjusting belts, chains, etc."

The rest of the pamphlet is made up of drawings of the chains and cutters, a list of parts recommended for use in trenching to various depths, parts installation details, and a parts list. This manual was offered and admitted into evidence as plaintiff's exhibit 11.

The 468R model is a trencher intended for one-man operation. It is powered by a 12-horsepower gasoline engine driving a cross shaft with a Vee belt with a tightening arrangement. There are two handlebars mounted on the end opposite the boom. The boom is lowered into the ground to the desired depth hydraulically. The digging or trenching is done by means of a chain, and teeth which travel around the boom in a clockwise direction, pulling dirt from the ground. The ditch or trench is created by the rearward motion of the four wheels driven by a ratchet off the cross shaft, as the machine moves in the direction of the handlebars. The trencher is operated by three levers mounted immediately forward of the handlebars.

On the afternoon of May 18, 1961, plaintiff was directed by his father, James Williams, Sr., to use the 468R trencher. Neither he nor his father had had prior experience with this particular type of machine. He operated if for about 2½ hours, without mishap or difficulty. He moved it, on its own power, a distance of several blocks to the area where he was to operate it the next day.

On the morning of May 19th plaintiff was operating the trencher in an area which sloped toward a road. To level the machine and prevent undercutting, a laborer built up the side of the slope with dirt and boards. The trencher was equipped with a boom estimated to be 6 feet

long, and plaintiff was trenching at depths which varied from 24 to 36 inches. He was standing between the handlebars, leaning his left hip on the machine to prevent its "drifting" down the slope. As the trencher was digging onto a level area adjacent to a culvert, the digging chain struck an old ¾-inch gas service pipe approximately 20 inches below ground level. Plaintiff testified that he had not previously run into any obstruction above ground, and understood that there was nothing underground. The motor of the trencher pulled down, and the trencher jumped backward a distance great enough so that the boom came out of the ground. In so doing, the trencher struck plaintiff, knocking him to the ground. The trencher moved forward into the trench, and jumped backward again, striking plaintiff a second time. The laborer working with plaintiff stopped the machine by striking the clutch lever with a shovel, thus disengaging the clutch.

Mr. Williams, Sr. testified that when he assembled the machine he found no instruction manual, but that when the machine was placed in operation someone brought a manual to the job and placed it on the trencher. Plaintiff testified that he read the manual on the evening of May 18th, at which time he had operated the trencher for several hours. After reading the manual he had made a repair on the hydraulic line going to the lift cylinder on the boom. He did not ask anyone, nor did anyone instruct him with respect to the operation or safety features of the trencher.

Dr. Gerald Dreifke, Professor of Electrical Engineering and Director of the Graduate Program at St. Louis University called by plaintiff as an expert witness testified that the trencher, when digging, exerts a force to the rear, and downward to the ground, when it strikes a fixed object it continues to pull backward, the fixed object pulls on the chain that removes the dirt from the trench, the tires are compressed and if the trencher chain

is released from the fixed object such as a buried pipe the reacting forces will cause the machine to lurch toward the rear and up. The pulley belt drive is designed to be adjusted so that the belts are tight enough to dig and drive the trencher, yet loose enough so that if it strikes a pipe or other object it will slip before the reacting forces described can be built up. He expressed the opinion that it is difficult to keep machinery adjusted so that it is tight enough to drive, yet loose enough to slip at the right time. He suggested that a better design, which could be effected without substantial increase in cost of producing the trencher, would be to use a positive direct drive and an extra auxiliary-type clutch set to slip at some prescribed force and thus prevent excessive lurching. He also suggested that a crowbar or caterpillar design for use instead of the rubber-tired wheels would reduce the tendency to lurch to the rear. There could also be an "outrigger" device that would prevent the pressures on the wheels.

Robert Lusk, general superintendent for Somerville-Illinois, plaintiff's employer, called by the defendant, testified that Somerville had used its 4 machines from May 19, 1961, down to the date of trial, and had had no accidents reported, no difficulty obtaining operators, and no complaints that the machine was unreasonably dangerous to the user.

Albert Bensinger, an equipment rental dealer testified that he had had 33 years of experience in mechanical work, had dug approximately 1,000 feet of trench with a 468R Trencher, and normally operates the machine from the side. He testified that although he rents other makes of machines, he usually used this model for his own work. In response to a hypothetical question, he expressed the opinion that he did not see how the machine could react in the manner described by plaintiff, that the tendency upon striking a fixed object would be to pull up and forward, raise the front wheels, but not to

lurch backward. He further stated that he has never had a complaint that the trencher was unsafe, and also expressed the opinion that the power unit does not lack a proper safety, but that there are necessary adjustments on the drive belts to allow slippage.

Warren M. Huff, Jr., a consulting engineer called by the defendant, in answering a hypothetical question, expressed the opinion that upon being caught in an object such as the buried pipe, the trencher would endeavor to pull itself forward, the digging chain would slip over the obstruction from one digging tooth to the next and this would result in a series of oscillating motions. He further stated it was his opinion that if the digging tooth were permanently caught, it would kill the engine of the trencher, and the tendency would be to pull the machine forward, the front end down, and the rear end up. He expressed the opinion that the controls are not at an improper or unsafe position, the machine is best operated from the side, in order for the operator to be close to the safety-clutch lever, the power unit did not lack a proper safety throw-out clutch, did not lack proper adjustment methods on the drive belts, and contained conventional, normal, common methods of belt adjustment. He further stated that the type of clutch on this machine is widely used and is almost universally used on small equipment.

Delbert "Bus" Brown testified that he was the designer of the machine, when he designed it there was no small trencher on the market, he had demonstrated it for safety engineers, and made some changes, power companies and utility companies were interested, and had bought it, in his opinion it is impossible for the trencher to lurch to the rear more than 6 or 8 inches, if the machine strikes an object like a pipe, it will rise until it catches on the next tooth, and in the event that it does not jump from tooth to tooth, it will pull down. If the belts do not slip, the machine will buck up and down. He testified that he had dug over 100,000 feet

354

of trench with this type of machine, and in his 8 years of experience with the machine, it had never lurched back throwing the boom clear out of the ground when it hit an obstruction. He had not had any injuries reported from the use of this type of trencher. He further expressed the opinion that the controls are not at an improper place or unsafe distance, the machine did not lack a proper safety throw-out clutch, the belt-tightening clutch, if properly adjusted, will slip, and if it does not slip, the machine will buck up and down, the belts are easily adjusted, and the machine does not lack proper adjustment methods on its driving belts. He further testified that when operating on a slope you can "lay pipe down along the line, stake it, and turn the machine loose, it will run straight." He further stated that a 6-foot boom on a 32-inch trench would not give enough traction because it would be too straight out from the machine and the wheels would be working against the cutter teeth. He stated that in digging 30 to 36 inches a 42-inch boom should be used, and the instruction manual (Plaintiff's Exhibit 11) contained instructions on this matter.

At the start of the trial plaintiff's fourth amended complaint alleged that the trencher was in an unreasonably dangerous condition when it left the control of the defendant in one or more of the following respects:

"A. The controls were placed in an improper place and at an unsafe distance from the normal operating position of the operator.

"B. The power unit lacked a proper safety throwout clutch or some other safety device on the digger part and on the propelling unit to prevent the machine from bucking when the digger hit an obstruction in the ground.

"C. Lacked proper adjustment methods on drive belts to allow slippage of propelling wheels if digger hit obstruction in ground.

355

"D. Lacked a safety device within easy reach of the normal operating position of the operator, the purpose of the device being to stop the machine in an emergency.

"E. Contained a center of gravity too high from the ground and/or too far to the rear resulting in a top heavy attitude."

At the close of the plaintiff's case the court allowed plaintiff's motion to strike paragraphs D and E of his allegations of defects and was given leave over defendant's objection to add Paragraph H which reads as follows:

"'H.' There was no warning or notice on said machine that it was dangerous to operate it from behind and between the handlebars."

In its "Second Affirmative Defense," defendant alleges that plaintiff was qualified as an operating engineer, held himself out to be qualified to operate the 468R Model trencher whereas in fact he had not operated one, that under the direct supervision of James Williams, Sr., he undertook to operate the trencher without prior experience, training advice or instruction and thereby "assumed all risk in relation to design, manufacture, use, handling, control, assembly, operational characteristics, abilities and limitations of said Bus Brown Trencher and did, then and thereby subject himself, voluntarily and without necessity, to any risk, if any, related to the operation of said trencher, or to any risk related to the operation or design characteristics thereof."

At the close of all the evidence the court denied defendant's motions for directed verdict as to the paragraphs A, B, C and H, and allowed plaintiff's motion for a directed verdict on the issues made by defendant's second affirmative defense.

356

At defendant's request, 4 special interrogatories were submitted to the jury and answered:

> "Were the controls of the Bus Brown Trencher Unit 468R placed in an improper place and at an unsafe distance from the normal operating position of the operator?
> "No.
> "Did the power unit of the Bus Brown Trencher Unit 468R lack a proper safety throw-out clutch or some other safety device on the digger part and the propelling unit to prevent the machine from bucking when the digger hit an obstruction in the ground?
> "Yes.
> "Did the Bus Brown Trencher Unit 468R lack proper adjustment methods on the drive belts to allow slippage of the propelling wheels if the digger hit an obstruction in the ground?
> "Yes.
> "Was the Bus Brown Trencher Unit 468R unreasonably dangerous to the user because there was no warning or notice on said machine that it was dangerous to operate it from behind and between the handle bars?
> "Yes."

Defendant contends that the court erred in denying its motion for directed verdict at the close of the plaintiff's case and enumerates fifteen reasons why its motion should have been allowed.

Defendant argues that there is no proof of (a) the condition of the trencher when it left defendant's control, (b) faulty or defective design, (c) unreasonably dangerous condition, (d) foreseeability of the mishap resulting in plaintiff's injury, (e) duty to place a warning on the machine.

357

In Suvada, the Supreme Court commented favorably upon, and quoted from, the opinion of the Supreme Court of California in Greenman v. Yuba Power Products, Inc., 59 Cal2d 57, 27 Cal Rptr 697, 377 P2d 897. That opinion explicitly and unequivocally holds that liability may be imposed upon a manufacturer under the doctrine of strict liability as the result of a defect in design. This court so held in Wright v. Massey-Harris, Inc., 68 Ill App2d 70, 215 NE2d 465.

Defendant argues that the testimony of plaintiff's expert witness does not prove a defect in design, that its evidence overwhelmingly shows that the design is one that is widely used, not defective, and its use does not constitute a defect in the product. Although in Darling v. Charleston Community Hospital, 33 Ill2d 326, 211 NE2d 253, the issue was the defendant's negligence, we find the following language at page 331, to be applicable here, "As has been seen, the defendant argues in this court that its duty is to be determined by the care customarily offered by hospitals generally in its community. Strictly speaking, the question is not one of duty, for '. . . in negligence cases, the duty is always the same, to conform to the legal standard of reasonable conduct in the light of the apparent risk. What the defendant must do, or must not do, is a question of the standard of conduct required to satisfy the duty.' (Prosser on Torts, 3rd ed at 331.) 'By the great weight of modern American authority a custom either to take or to omit a precaution is generally admissible as bearing on what is proper conduct under the circumstances, but is not conclusive.' (2 Harper and James, The Law of Torts, § 17.3, at 977–978.) Custom is relevant in determining the standard of care because it illustrates what is feasible, it suggests a body of knowledge of which the defendant should be aware, and it warns of the possibility of far-reaching consequences if a higher standard is required. (Morris, Custom and Neg-

358

ligence, 42 Columbia L Rev 1147 (1942) ; 2 Wigmore, Evidence, 3rd ed §§ 459, 461.) But custom should never be conclusive. As Judge Learned Hand said, 'There are, no doubt, cases where courts seem to make the general practice of the calling the standard of proper diligence; we have indeed given some currency to the notion ourselves. . . . Indeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices. It never may set its own tests, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission.' The T. J. Hooper (2nd Cir 1932) 60 F2d 737, 740." Quoting further from Darling (p 332), the testimony of Dr. Dreifke "aided the jury in deciding what was feasible and what the defendant knew or should have known." The issues of defect and unreasonably dangerous condition were questions of fact, and the answers to defendant's second and third special interrogatories leave no doubt as to the jury's findings. The testimony of James Williams, Sr., who uncrated and assembled the machine sufficiently proves that the defect in design was present in the trencher when it left defendant's control.

▇▇ Defendant argues that the long history of use of the trenchers without prior mishap negates the foreseeability of what occurred. There are many authorities for the proposition that prior use of a product by many people over a considerable period of time does not preclude a finding of foreseeability. Martin v. Bengue, Inc., 25 NJ 359, 136 A2d 626, and cases therein cited. What was foreseeable was a question of fact, and defendant's evidence of prior good fortune does not warrant our disturbing the jury's finding.

▇▇ Defendant argues that the trial court "erred in allowing amendment of Fourth Amended Complaint

by addition of Sub-paragraph 'H' creating a duty on defendant unknown to law." Contrary to defendant's contentions, a duty to warn is no stranger to the law of Illinois. The general rule is well stated in Kirby v. General Paving Co., 86 Ill App2d 453, 229 NE2d 777, wherein at page 779, the court said: "A duty to warn exists where there is unequal knowledge, actual or constructive, and the defendant, possessed of such knowledge, knows or should know that harm might or could occur if no warning is given. (Citing cases.)" Prior to Suvada, in an action based on negligence (Biller v. Allis Chalmers Mfg. Co., 34 Ill App2d 47, 180 NE2d 46), the Appellate Court recognized a duty to warn where the propensities of a machine might create an unreasonably dangerous condition. A review of the authorities leaves little question that where a manufacturer has reason to foresee that danger may result from a particular use he may be required to give adequate warning of the danger. In the absence of adequate warning, liability may arise from use of an instrumentality not otherwise defective, since failure to warn may itself be the defect which causes injury.

Defendant contends that the evidence shows that there had never been any prior occurrence when the trencher lurched to the rear, that its evidence shows that it could not happen in that manner and there was no element of foreseeability which could require a warning to be placed on the machine. In discussing a similar contention the United States Court of Appeals in Butler v. L. Sonneborn Sons, Inc., (CA 2nd) 296 F2d 623, at page 625, said: "Appellant's claims, presented in its requests to charge and also as objections to the sufficiency of the evidence, that its method of packaging Lapidolith had not been proved unsafe, and that it was not bound so to package the compound as to withstand what it contends to have been unforeseeable mishandling by Conn Structors, misconceive the theory on which the

360

case was submitted to the jury. This was not that appellant had failed in its duty to package its product in a reasonably safe manner—indeed, no suggestion of any better manner has been made—but rather that it had neglected to perform the small additional task of affording appropriate warnings that care in handling the product was needed, both to prevent it from becoming dangerous and to protect if it had. A duty to warn, under circumstances not dissimilar to those here presented, has been widely recognized. True, a manufacturer of an ordinarily safe article is not held to that degree of clairvoyance which hindsight alone can give. But, especially when injury is likely to be serious if trouble occurs, even slight foreseeability may warrant, and a long history of good fortune will not necessarily exclude, a conclusion by the trier of the facts that prudence requires the manufacturer to take on so small an added burden."

Defendant argues that the manual (Exhibit 11) contains operating and safety instructions which encompass any warning which might reasonably be necessary. The manual makes no mention of the correct position for the operator and there is no warning either on the machine or in the manual against operating from a position between the handlebars. Defendant states that "the handlebars are for the purpose of roading the machine forward, into basic position," but there is nothing in the manual to that effect.

■ In Frumer-Friedman, Products Liability, section 8.05, the authors state: "There is substantial authority that the manufacturer must give both adequate directions for use and adequate warning of potential danger. Directions and warnings serve different purposes. Directions are required to assure effective use, warning to assure safe use. It is clear from the better reasoned cases that directions for use, which merely tell how to use the product, and which do not say anything about

the danger of foreseeable misuse, do not necessarily satisfy the duty to warn." We agree.

 Assuming, arguendo, that the language in the manual could be construed to be a warning, there remains the issue of whether a warning, not placed on the machine itself, is adequate. Whether the defendant should have foreseen that the trencher would be used by an individual who had not seen the manual and, therefore, should have placed the warning on the machine itself is a question of fact. This point is well illustrated by the concurring opinion of Mr. Justice Swygert in McKay v. Upson-Walton Co., (CA 7th), 317 F2d 826. Although Judge Swygert concluded that there was no showing that a failure to warn was the proximate cause of the fatal accident out of which the case arose, he said at page 828: "I do not join in the majority's views that a manufacturer may immunize himself from liability by printing a catalog that may or may not accompany the device into the hands of workmen—inexperienced perhaps—who are unaware of the device's inherent limitations, particularly when the normal use to which the device is put may endanger men's lives if overloaded.

"Defendant-manufacturer, Upson-Walton, sold the block and hook in question to Brock Tool and Supply Company which in turn apparently sold it to Phillips Getschow Company. While there was evidence that defendant's customers were supplied with catalogs which listed the working capacity of its products, there was no proof that these catalogs came into the hands of ultimate consumers such as Phillips Getschow or its employee Brown, the rigger who was responsible for lifting the pipe that killed the decedent, McKay.

"While there was also proof that capacities of standard hoisting equipment are listed in standard reference books available to the trade, I am not prepared to say that either the catalog or the reference books constituted the adequate warning that may be required of a manufacturer

to a user of his product who is ignorant of the limitations of the product and which product may be dangerous if such limitations are exceeded." We conclude that the court properly submitted the issue to the jury.

In its brief defendant states that "the court erred in striking on plaintiff's motion, defendant's second affirmative defense." An examination of the record shows that the court did not strike the defense, it directed a verdict on the issue. Much of defendant's argument on this point is directed to the proposition that contributory negligence or assumption of risk is properly an issue in this type of case, and is, therefore, irrelevant to the question presented. The question presented is not whether contributory negligence is an issue, but whether the court erred in directing a verdict.

Defendant argues that the defendant provided adequate instructions for the use of its product, the instructions were deliberately not followed, plaintiff first operated the trencher without reading the manual, then after admittedly reading it, operated the machine from between the handlebars, at full throttle on unlevel ground while leaning against the handlebars. Defendant argues further the plaintiff's expert witness testified that it was clear from the instruction manual that if the belts were not properly adjusted "the machine would give a shock."

Defendant argues that under the holdings in Dittmar v. Ahern, 37 Ill App2d 167, 185 NE2d 264, and Borowicz v. Chicago Mastic Co., (CA 7th), 367 F2d 751, the plaintiff was clearly guilty of contributory negligence. In Dittmar there was a deliberate disregard of specific instructions on the part of a plastering contractor and the Appellate Court found the negligence of the contractor to be the proximate cause of the plaster failure. In Borowicz, on at least 8 prior occasions, the plaintiff had read a warning clearly printed on the label, and being aware of the danger of using the product near

flame, proceeded to do so and was injured. We fail to see how either opinion supports the contentions of the defendant.

 We have carefully examined the testimony and we fail to find any evidence that would support a finding that the plaintiff had proceeded unreasonably to use the trencher after discovery of a defect and becoming aware of danger, or that he unreasonably proceeded to encounter a known danger. The manual contains neither instructions as to where to stand when operating the machine nor a warning against standing between the handlebars. The only language which might be construed to be a warning is found under "Suggestions for Safety" and states "While lowering digging boom into the earth, keep everyone away from the front of the machine, because if digging chain should catch on some obstruction, it will tend to pull machine *forward somewhat*." (Emphasis ours.)

 In Smith v. Bishop, 32 Ill2d 380, 205 NE2d 461, in reviewing the action of the trial court in directing a verdict for the plaintiff on the issue of contributory negligence, the Supreme Court at page 383, said: "The rule is elementary that if there is any evidence of contributory negligence on the part of the plaintiff a question of fact is presented which must be left to the jury for determination. Whenever a question remains whether either party had performed his legal duty, or has observed that degree of care required of him by law, and its determination involves a consideration and weighing of the evidence, the question must be submitted as one of fact. But it is also the law that when all the evidence is considered in its aspect most favorable to the other party, together with all reasonable inferences, and it appears therefrom that there is no evidence from which negligence could reasonably be inferred, it is the trial court's duty to direct a verdict accordingly. And a court of review, in passing upon the propriety of the

trial judge's ruling should take into consideration the fact that he saw and heard the witnesses."

In Pedrick v. Peoria & E. R. Co., 37 Ill2d 494, 229 NE2d 504, at page 510, the Supreme Court said: "In our judgment verdicts ought to be directed and judgments n. o. v. entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand."

Applying the above stated rules to the evidence, we cannot say that the trial court erred in directing a verdict on this issue.

Defendant contends that the court erred in a number of rulings on its objections to evidence offered by the plaintiff. The only reference to improper rulings on plaintiff's evidence is stated as follows:

"B. That the court during the trial of this cause erred in the following respects:

"1. In overrulling (sic) objections of the Defendant Brown Manufacturing Company, made from time to time throughout the trial, in relation to testimony offered in the trial of said cause, the details of which appear in the transcript of the testimony herein."

The errors now complained of were not specified with sufficient particularity in the post-trial motion, Perez v. Baltimore & O. R. Co., 24 Ill App2d 204, 164 NE2d 209; Lukich v. Angeli, 31 Ill App2d 20, 175 NE2d 796; Lawler v. Pepper Const. Co., 33 Ill App2d 188, 178 NE2d 687, but since plaintiff has not seen fit to raise the issue of the proper preservation of these points, we elect to review them.

Defendant contends that the court erred in admitting, over defendant's objections, certain photographs of the trencher. A detailed discussion of defendant's

contentions or the authorities cited is of no precedential value, and in our opinion the language on page 139 in Brennan v. Leshyn, 51 Ill App2d 132, 201 NE2d 167, disposes of all of defendant's contentions but one. Its final contention is that the court erred in admitting photographs which are "blow-ups" of smaller photographs because they are "cumulative and duplications." Upon review of the testimony with respect to the photographs we fail to see in what manner their admission could have prejudiced defendant, and hold that the court did not err in admitting them.

Defendant argues that the court erred in admitting two X-ray films offered and admitted, over objection, during the testimony of a physician called by plaintiff. In its argument defendant states "This doctor's entire testimony was highly colored and favorable toward plaintiff," and "without detailing, a check of his entire testimony indicates he was a 'Plaintiff's Witness' in the strict sense. In particular see cross examination where he admits making a practice of testifying for plaintiffs."

These arguments are not relevant to the issue of whether the court erred in admitting the X rays. We have considered those of defendant's arguments which are relevant, and the authorities cited in support thereof, and conclude that the contentions made were considered and rejected in Smith v. Broscheid, 46 Ill App2d 117, 196 NE2d 380. The trial court did not err in its rulings.

Defendant contends that the court erred in permitting the physician witness to state his opinion with respect to the prognosis of plaintiff's condition, because plaintiff's history was within his knowledge. We have examined the cases cited by defendant, Fellows-Kimbrough v. Chicago City Ry. Co., 272 Ill 71, 111 NE 499; Clifford-Jacobs Forging Co. v. Industrial Commission, 19 Ill2d 236, 166 NE2d 582; and City of Decatur v. Fisher, 63 Ill 241, and do not find them to support de-

fendant's contention. An examination of the record shows that although admittedly the doctor had taken and knew plaintiff's history, upon being asked in cross-examination whether in his testimony he had taken the history into consideration, he stated: "I have consciously tried in this testimony to eliminate history or influence and subjective elements."

In Crane Co. v. Industrial Commission, 32 Ill2d 348, 205 NE2d 425, at page 353, the Supreme Court said: "The rule has often been stated that the opinion of a medical expert who does not treat the patient, but examines him for the purpose of testifying, is not admissible if it rests partly upon the expert's own observation, and partly upon a history of subjective symptoms supplied by others. (Citing cases.)

"However, the mere fact that an examining physician obtains a history from the patient does not disqualify his expert testimony based on objective findings or upon a hypothetical question. (Citing cases.)"

We have carefully examined the testimony of the doctor and find that the court did not err in permitting the doctor to state the prognosis.

■■■ Defendant contends that the court erred in admitting into evidence plaintiff's exhibit 23 which was identified as a copy of plaintiff's employment record as shown by the records of Local 520 of the Operating Engineers. The witness who identified it testified that it showed the date on which plaintiff was assigned to a job, its location, the name of the contractor, and the type of machine plaintiff was to operate. It purported to cover the period from April 11, 1960, through September 18, 1962. The record reflects that defendant made a general objection to the exhibit, which raised only the issues of relevancy and materiality, Johnson v. Bennett, 395 Ill 389, 69 NE2d 899. The exhibit is clearly relevant

and material to the issues and the court correctly admitted it into evidence.

■ Defendant contends that the court erred in permitting 4 witnesses called by plaintiff to testify in rebuttal. Defendant argues that the testimony in question was not rebuttal but "produced a totally new, unrelated, indefensible set of facts."

The abstract of the testimony of Warren Peoples reflects the following: "Objection," "Defense set forth basis of objection," "Witness allowed to continue over objection."

In the abstract of the testimony of George Prickett the following appears: "Defendant objects. Renews all objections. Court—same objection. Same ruling."

During the testimony of Lester Feltmeyer: "Objection renewed. Court recognizes same ruling."

During the testimony of Lawrence C. Mack: "Objections renewed. Court: Same ruling."

The only indication in the abstract of the nature or basis of the objections is found in what appear to be paraphrasings of the arguments of defense counsel to the court. These consist of the following: "All of the questions asked of Mr. Brown by me on direct examination were based upon the evidence the Plaintiff himself put in the case. The questions related to the hitting of a pipe not cut through."

"This case is tried entirely upon the hitting of a three-quarter-inch pipe and nothing else."

Although somewhat uncertain as to what counsel meant by the statements, we interpret the contention to be that rebuttal must be limited to the single proposition of whether the trencher would jump backward upon striking a ¾-inch pipe. The scope of permissible rebuttal, however, is not quite so narrow.

Defendant's witness Brown testified that the machine has never lurched back; Burlingame that he had never heard of an occurrence with the machine similar to the

one to which plaintiff testified; Bensinger that he did not see how it was possible for the trencher to act in the manner in which plaintiff described; Huff that under the circumstances described by plaintiff, the machine "will endeavor to pull itself forward."

 The substance of the testimony of which defendant complains is that these witnesses had seen trenchers of this model lurch backward upon striking underground obstructions. In City of Sandwich v. Dolan, 141 Ill 430, 31 NE 416, at page 440, the Supreme Court said: "Rebutting evidence is that which is produced by the Plaintiff to explain, repel, counteract or disprove the evidence given by the defendant."

Upon the record before us, the testimony of plaintiff's witnesses fits this description and the trial court did not abuse its discretion in admitting it.

Defendant complains of the giving of several instructions tendered by plaintiff, and the refusal to give instructions tendered by defendant.

Defendant has failed to abstract all of the instructions, those which appear in the abstract do not bear any notation as to whether they are, or are not, in IPI, and since no part of the conference on instructions is abstracted it is necessary to look to the record to ascertain the basis for defendant's objections and the court's rulings. This we have done, and conclude that what has been heretofore said with respect to contributory fault, is determinative of defendant's contentions as to plaintiff's instructions 9 and 11A. With respect to plaintiff's instruction 12 and defendant's instructions 1, 2, 3, 4, 4A, 5, 6 and 7, the contentions are without merit.

 Defendant argues that the court erred in submitting the case to the jury on the strict liability theory of Suvada and plaintiff, because of his pleadings, should have been required to prove that his injuries were the result of defendant's negligence. This contention is based on the fact that in his fourth amended com-

plaint, after alleging the specific defects above set forth plaintiff alleged "That as a direct and proximate result of some one or more of the aforementioned acts of negligence. . . ." In support of its argument defendant cites Jorgenson v. Baker, 21 Ill App2d 196, 157 NE2d 773, and Acosta v. Holzer, 61 Ill App2d 369, 209 NE2d 854, contending that these cases are authority for the proposition that a pleading is to be construed most strongly against the pleader, and plaintiff should therefore, be required to prove negligence. It is well established that the essential purpose of a complaint is to inform the defendant of a valid claim, Hall v. Gruesen, 22 Ill App2d 465, 161 NE2d 345, and that pleadings are to be liberally construed with a view toward doing substantial justice.

The record demonstrates beyond question that defendant understood plaintiff's theory and was in nowise misled or surprised. The contention is wholly without merit.

Defendant contends that to permit plaintiff to proceed under the doctrine of Suvada is an ex post facto application of the law, would constitute legislation by this court, and is violative of the rule of stare decisis.

In its brief defendant states "Defendant contends that the doctrine of strict tort liability as considered in (Suvada) is obiter dicta and not authority. Admittedly it is an indication of the courts (sic) intention to adopt the theory. However, as to the case concerned the only need for considering the theory related to destroying 'privity' and to this extent (separate from the question of ex post facto application separately raised) it is authority in this case."

In Suvada at page 623 the Supreme Court said: "The argument that the abolition of privity and negligence in this type of case should come from the legislature is well answered by a paraphrase of our reply in Molitor v. Kaneland Community Unit Dist., 18 Ill2d 11, 'The

370

doctrine of school district immunity (privity and negligence) was created by this court alone. Having found that doctrine to be unsound and unjust under present conditions, we consider that we have not only the power, but the duty, to abolish that immunity (doctrine). "We closed our courtroom doors without legislative help, and we can likewise open them." ' 18 Ill2d 11, 25."

In Molitor, at page 26, the Supreme Court said: "We have repeatedly held that the doctrine of stare decisis is not an inflexible rule requiring this court to blindly follow precedents and adhere to prior decisions, and that when it appears that public policy and social needs require a departure from prior decisions, it is our duty as a court of last resort to overrule those decisions and establish a rule consonant with our present day concepts of right and justice. (Bradley v. Fox, 7 Ill2d 106, 111; Nudd v. Matsoukas, 7 Ill2d 608, 615; Amann v. Faidy, 415 Ill 422.) As was stated by the New Jersey Supreme Court in overruling the doctrine of charitable immunity: 'The unmistakable fact remains that judges of an earlier generation declared the immunity simply because they believed it to be a sound instrument of judicial policy which would further the moral, social and economic welfare of the people of the State. When judges of a later generation firmly reach a contrary conclusion they must be ready to discharge their own judicial responsibilities in conformance with modern concepts and needs. It should be borne in mind that we are not dealing with property law or other fields of the law where stability and predictability may be of the utmost concern. We are dealing with the law of torts where there can be little, if any, justifiable reliance and where the rule of stare decisis is admittedly limited. See Pound, supra, 13 NACCALJ at 22; Seavey, Cogitations on Torts, 68 (1954); Cowan, "Torts," 10 Rutgers L Rev 115, 119 (1955).' Collopy v. Newark Eye and Ear Infirmary, 27 NJ 29, 141 A2d 276.

"In here departing from stare decisis because we believe justice and policy require such departure, we are nonetheless cognizant of the fact that retrospective application of our decision may result in great hardship to school districts which have relied on prior decisions upholding the doctrine of tort immunity of school districts. For this reason we feel justice will best be served by holding that, except as to the plaintiff in the instant case, the rule herein established shall apply only to cases arising out of future occurrences. This result is in accord with a substantial line of authority embodying the theory that an overruling decision should be given only prospective operation whenever injustice or hardship due to reliance on the overruled decisions would thereby be averted."

In contrast to Molitor, in Gannon v. Chicago, M., St. P. & P. Ry. Co., 22 Ill2d 305, 175 NE2d 785, at page 324, the Supreme Court said: "Nevertheless, plaintiff argues that this court should follow the course taken in the Molitor case (Molitor v. Kaneland Community Unit Dist., 18 Ill2d 11) and hold that our interpretation of the law shall be prospective in operation and not affect plaintiff's action. In the Molitor case the rule of law expounded in the opinion was held applicable only to the plaintiff therein and to future plaintiffs because of the overwhelming financial hardship to school districts whose sovereign immunity was uprooted, and who would otherwise be subjected retroactively to liability in hundreds of cases. In the instant case our interpretation of the Scaffold Act imposes no hitherto unrecognized liability on anyone; hence, there is no basis for following the court in the Molitor case and invoking the 'Sunburst Doctrine.' "

The element present in Gannon which constrained the Supreme Court to remand the cause is stated as follows: "While we recognize that no one has a vested right in any decision (Spiegel's House Furnishing Co. v. Industri-

al Com., 228 Ill 422), we are not insensitive to the possible hardship upon plaintiff in proceeding with this litigation, apparently in reliance upon the Kennerly case and the unqualified dictum in the earlier Gannon case. Therefore, pursuant to section 92(I)(e) of the Civil Practice Act, authorizing a reviewing court to grant any relief, including remandment, that the case may require, we shall follow the course taken in Petty v. Illinois Central Railroad Co., (11 Ill2d 485, 489), and direct that the remanding order be reinstated so that plaintiff will have an opportunity to properly try his case in the light of the interpretation of the law set forth herein."

That essential element is lacking here, because defendant was apprised of, and tried the case on the theory of Suvada.

 As to the position of this court, we are bound by Suvada under the rule stated in Agricultural Transp. Ass'n v. Carpentier, 2 Ill2d 19, 116 NE2d 863, wherein at page 27, the Supreme Court said: "Where the Supreme Court has declared the law on any point, it alone can overrule and modify its previous opinion, and the lower judicial tribunals are bound by such decision and it is the duty of such lower tribunals to follow such decision in similar cases."

 Defendant's final contention is that "the verdict is excessive and in and of itself related to the unfairness of the entire trial." The evidence shows plaintiff was 33 years of age at the time of the injury, that he suffered a compressive fracture of a lumbar vertebra, that there was arthritis at the site of the fracture, and some injury to his knee. As the result of his disability he lost earnings of approximately $4,800. Plaintiff testified that the back injury caused pain, and the medical testimony indicates that injuries of this type are painful. The courts have repeatedly held that the amount of damages to be assessed is peculiarly a question of fact for the jury, and if the jury is properly instructed on the

measure of damages, an appellate court should not substitute its judgment as to the sum to be awarded in a given case, for that of the jury. Smith v. Illinois Cent. R. Co., 343 Ill App 593, 99 NE2d 717; Hulke v. International Mfg. Co., 14 Ill App2d 5, 142 NE2d 717; Ford v. Friel, 330 Ill App 136, 70 NE2d 626.

From our examination of the evidence, we cannot say the verdict was excessive.

In two sections of its brief defendant makes statements which might be construed to imply that some improper use was made of an opinion of the Appellate Court, and might further be construed to imply that the filing of the opinion was timed to aid plaintiff in the trial of this case. At one point, after reciting certain matters extraneous to the record, defendant states: "The court, we feel, should be interested in the timing and use of this opinion in this case.

"It must be noted that also a motion setting forth this circumstances (sic) was filed in this (the reviewing court) and was summarily overruled. To the extent possible—and as clearly as Defendant knows how—this point is raised, protected and relied upon as a point to be later considered (if necessary) by a higher tribunal."

The motion to which defendant refers is not verified, and asserts "this entire judicial bench, . . . cannot and is not an impartial tribunal to hear and determine this appeal." It prays that the cause be transferred to the Fourth District, and alternatively, that a "complete, separate and distinct panel of Justices" hear the case.

The motion bears no designation other than the caption "Motion" and for lack of a more specific designation, appears to resemble a motion for change of venue. In the motion defendant states there is no authority to support it, and this court has found none.

 The inalienable right to trial or review before an impartial court is a treasured principle of our legal system, and as stated in Blackstone (Cooley's Blackstone

—4th Edition, Vol III, page 384) "The administration of justice should not only be chaste, but should not even be suspected."

The chastity of the administration of justice, like that of a lady of virtue, should not, without fear of reprisal if proven false, be subjected to slander by means of idle rumors or malicious gossip spread by a rejected and un-requited suitor. To that end, every statutory provision for change of venue of which this court is aware requires verification, a certificate of counsel of record that the application for change is made in good faith, or both.

We do not imply that verification or certification of counsel would have created any right to the relief sought, nor need we speculate as to what ruling might have ensued had the allegation of lack of impartiality been made under oath, thus according it a degree of dignity at least equal to that formerly required in similar proceedings before Justices of the Peace.

Upon completion of oral argument counsel were asked to explain the statements contained in defendant's brief. This court was assured that there was no intent to impugn the integrity of any member of the Appellate Court, and this court accepts the assurance without question. We attribute the occurrence to what is aptly described by the Appellate Court in its supplemental opinion and ruling on petition for rehearing in Illinois Cent. R. Co. v. Michigan Cent. R. Co., 18 Ill App2d 462, 152 NE2d 627, when after discussing the primary and proper purpose of a petition for rehearing, the court said at page 499: "Petitions for rehearing are sometimes used to serve a secondary purpose—to enable counsel to assuage the digestive pains which follow defeat in a hard fought case where stakes are high. This court is comprised of men who have practiced law and experienced such pains. We are not unsympathetic to the use of the petition for its secondary purpose, even though it is not in accord with the rules.

375

However, we have observed that the indignation is often in inverse ratio to the worthiness of the cause."

For the reasons set forth, the judgment of the Circuit Court of Madison County is affirmed.

Judgment affirmed.

EBERSPACHER and CREBS, JJ., concur.