JAMES NEAL, Plaintiff-Appellee, *v.* WHIRL AIR FLOW CORPORATION *et al.*, Defendants-Appellants.

Third District   No. 75-51

Opinion filed November 5, 1976.

Arthur R. Kingery, of Peoria, for appellants.

Frederick W. Allen, of Peoria, for appellee.

Mr. JUSTICE STENGEL delivered the opinion of the court:

Plaintiff James Neal brought this product liability action against defendants Whirl Air Flow Corporation and Whirl Air Flow Equipment and Supply Company to recover for loss of his left hand as a result of an industrial accident. Following a jury trial, a verdict was returned awarding plaintiff $120,000 damages. Defendants appeal from the judgment entered on that verdict.

At the time of the accident plaintiff, a journeyman pipefitter, had been employed for five months by Caterpillar Tractor Company to work in the maintenance department at the Mapleton Foundry. One part of the foundry made cores for large diesel tractors. The material used in the

core-making machines consisted of a sand and oil mix which was transported under pressure by means of a "Large Oil Sand Delivery System" designed and manufactured by defendants. The system consisted of a control panel, a mixer, a pressure vessel, several hundred feet of four-inch pipe which led to receiver switches at six stations. There were two branches or legs of the system. One leg contained station 1, 2, 3, and 4, while the other leg contained stations 5 and 6. After a batch of material was mixed and pressurized, it was blown through the pipes to a selected station. The switch at that station would deflect the material down into a hopper from which it was fed into the core-making machines. This system was operated from a central control panel on which appeared a schematic diagram of the system showing the six stations arranged on two different legs. The system was designed so that, if the switch were open on station 3 and the operator at the control panel attempted to send material to station 5 or 6 on the other leg of the system, the switch on station 3 not in use would close. The control panel was about 200 feet from switch 3. The system was laid out so that the operator's station was not within view of the switches.

On March 30, 1971, plaintiff and another employee, Paul Chrisman, were assigned to clean a clogged switch at station 3. This was done by removing a section of pipe which was provided at that point for maintenance purposes to clean the switch. When the main electrical control panel was locked out, it was possible to reach the clogged area by activating the switch at station 3 by pushing a manual override button which raised the switch by air power.

Prior to March 30, 1971, plaintiff had worked on other machinery at the foundry, but he had never been assigned to work on the sand delivery system. Chrisman, who had been employed at Caterpillar for 15 years, went to the control panel and locked out the electrical power in the system by pulling the main power switch and, according to his testimony, by locking the main switch handle with his safety padlock. Such locks were issued to all maintenance men for that purpose. After plaintiff and Chrisman had been working for 1½ or 2 hours on the clogged switch, the production foreman and the control operator came to station 3. The foreman told plaintiff and Chrisman that they had the whole foundry shut down, and asked if it would be okay to transport sand to station 5 or 6. After discussing the fact that the sand would be going in the opposite direction from station 3, on the other leg of the system, and would not blow sand toward station 3, Chrisman said it would be okay, and plaintiff also assented. Although the accounts of this conversation differed, each participant testified that he believed use of station 5 or 6 would not affect station 3, and there would be no danger. However, after the control panel was unlocked and activated, the switch at station 3 dropped into the

"down" or "through" position while plaintiff had his hand inside the switch pipe. As a result, his left hand was severed at the wrist.

Prior to the accident, defendants' service engineer did not know that when sand was being sent to one leg, the switches on the other leg not in use would operate. The testimony of the defendants' engineer revealed that there was no safety device at switch 3 to cut off the power and prevent the switch from operating. Neither the control operator nor the production foreman, nor the maintenance supervisor, nor the pipefitters knew that the switch at station 3 would close in such a situation before plaintiff's accident. The installation and maintenance manual supplied by defendants contained no instructions for cleaning clogged switches, although defendants admitted that such maintenance was expected and that the switches were in fact designed to permit it.

In his complaint, plaintiff alleged that the system was designed and manufactured so that it was in an unreasonably dangerous condition in that there were no adequate instructions, no warning signs against foreseeable danger to maintenance personnel, no safety lockout device on the switch at station 3, and no positive safety device to prevent a switch from closing while being cleaned. Defendants' answer consisted of a general denial and the affirmative defenses of assumption of the risk and misuse of the machine, both of which were stricken by the trial court at the close of all the evidence.

Defendants appeal from the judgment entered on the verdict returned in favor of plaintiff for $120,000. Defendants contend that the system or machine was not, as a matter of law, unreasonably dangerous, that the affirmative defense of assumption of the risk was erroneously stricken, and that various rulings on evidence were reversible error. In our opinion, the judgment of the trial court should be affirmed.

*Unreasonably Dangerous*

■■ The touchstone for product liability in Illinois is *Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 623, 210 N.E.2d 182, where the court held that a manufacturer can be held to strict liability in tort where the injured user of the product has proved that his injury resulted from a condition of the product, that the condition was an unreasonably dangerous one, and that the condition existed at the time it left the manufacturer's control. Defendants here insist that the term "unreasonably dangerous" should be construed to incorporate the definition set out in the Restatement (Second) of Torts §402A, comment (i) (1965), as follows:

> "The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."

Defendants then reason that the "ordinary consumer" of industrial

equipment is one possessing special knowledge and skills, and that the machine in this case was not unreasonably dangerous when used by trained workmen for whom it was intended.

This court expressly rejected the Restatement definition of "unreasonably dangerous" in *Pyatt v. Engel Equipment, Inc.* (3d Dist. 1974), 17 Ill. App. 3d 1070, 309 N.E.2d 225, 228-29. Contra, *Becker v. Aquaslide 'N' Dive Corp.* (4th Dist. 1975), 35 Ill. App. 3d 479, 341 N.E.2d 369.

In *Dunham v. Vaughan & Bushnell Mfg. Co.* (1969), 42 Ill. 2d 339, 247 N.E.2d 401, 403, the Illinois Supreme Court sought to clarify the "unreasonably dangerous condition" standard by equating it with the term "defect," which, the court said, " * * * rest[s] upon the common premise that those products are defective which are dangerous because they fail to perform in the manner reasonably to be expected in light of their nature and intended function." The court then concluded it is for the jury to determine whether, considering all the circumstances of the case, the product failed to perform in the manner that would reasonably have been expected, and whether this failure caused the injury.

In the case at bar, all parties concede that, when the switch at station 3 closed on plaintiff's hand, the system was functioning as designed. Rather than involving a malfunction because of a mechanical defect, this case turns upon whether the design of the machine was defective so that an unreasonable danger was encountered by maintenance personnel.

■■ Defendants argue that a manufacturer should not be required to design a system which is foolproof when used by persons who lack the knowledge and training expected of skilled maintenance personnel. In *Winnett v. Winnett* (1974), 57 Ill. 2d 7, 310 N.E.2d 1, a case relied upon by defendants, a four-year-old child was injured when her fingers became caught in a farm wagon's conveyor belt. The supreme court held that the child was not within the class of persons to whom injury from a defective product may reasonably be foreseen. However, here defendants admitted that maintenance of the kind being performed by plaintiff was anticipated when the system was manufactured. Thus plaintiff's use of the machine was foreseeable. Although plaintiff was unfamiliar with the system when he was assigned to work on it, the evidence establishes conclusively that more experienced employees, including the maintenance supervisor, the control panel operator, and the production foreman, were all unaware of the hazard which plaintiff encountered. Plaintiff's co-worker, Paul Chrisman, testified that he had also inserted his hand in the switch from the other side and stated, "It could have been my hand." Accordingly, plaintiff's lack of previous experience was not a factor contributing to his injury.

Defendants also claim that, as in *Rios v. Niagara Machine & Tool Works* (1974), 59 Ill. 2d 79, 319 N.E.2d 232, the manufacturer's duty to

produce a reasonably safe product was fulfilled by furnishing an appropriate safety device, *i.e.*, a lockout switch on the main control panel. *Rios* involved a multifunctional punch press, for which the plaintiff's employer had furnished an effective safety device but plaintiff-employee was not using it at the time he was injured. The court found that any unreasonably dangerous condition that may have existed when the machine left the manufacturer's control was fully corrected by the safety device and hence was not the cause of plaintiff's injury. Similarly, it is argued, had plaintiff here used his safety padlock on the control panel lockout switch, he would not have been injured.

Plaintiff contends that the lockout device provided was not an adequate safety measure under the circumstances. When the control panel was locked out, the operator could not provide sand material to any of the six core-making machines supplied by the system, and this could result in a costly interruption of foundry production. Continued operation of stations on the other leg would have been possible by providing a lockout device at each receiver switch. Testimony was conflicting as to the financial feasibility of separate safety lockouts.

When a manufacturer places into the channels of trade a finished product which should be provided with safety devices because without such it creates an unreasonable risk of harm, the fact that he expects that someone else will install such devices should not give him an escape clause.

Also, the absence of instructions or warnings for persons using the system could be found to have reduced the effectiveness of the lockout switch. Defendants' witness, the maintenance supervisor, testified on cross-examination that the company's general safety regulation requiring safety padlocks to be used by maintenance personnel, did not apply to multistation systems like this one because one station could be disabled and others could be operated safely.

The defendants claim this case must stand or fall on proof that the design or lack of warning made the system unreasonably dangerous. A manufacturer must give adequate direction and warning to the users of his product of any dangerous propensity about which he knows or should have known. Since a manufacturer is held to the degree of knowledge and skill of experts, the duty to warn will be imposed "where there is unequal knowledge, actual or constructive, and the defendant, possessed of such knowledge, knows or should know that harm might or could occur if no warning is given * * *." (*Williams v. Brown Manufacturing Co.* (5th Dist. 1968), 93 Ill. App. 2d 334, 236 N.E.2d 125, 139.) Thus, we believe it was for the jury to decide whether the general lockout device provided was an appropriate safety device for this system, and whether other safety devices were necessary and feasible. See *Rivera v. Rockford Machine & Tool Co.* (1st Dist. 1971), 1 Ill. App. 3d 641, 274 N.E.2d 828.

■■ Defendants also say that the system was not in the same condition as it left the factory because the pipes which guarded the switch had been removed. However, defendants' witnesses testified that the system was designed to permit just such maintenance activity and that removal of the pipes for cleaning was expected. Hence, the removal of the pipes was a foreseeable and intended use of the machine, and was not an alteration of condition.

■■ We therefore conclude that the evidence presented at trial did not establish as a matter of law that the switch was reasonably safe, or not unreasonably dangerous, in design, and that the court properly submitted that issue to the jury.

## Assumption of the Risk

Defendants assign as error the trial court order striking the affirmative defense of assumption of the risk. Considering all of the evidence in its aspect most favorable to defendants, as required by *Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, 261 N.E.2d 305, defendants assert that a question of fact was raised which should have been submitted to the jury.

In *Williams*, this defense was explained, as follows:

"[W]hile the test to be applied in determining whether a user has assumed the risk of using a product known to be dangerously defective is fundamentally a subjective test, in the sense that it is *his* knowledge, understanding and appreciation of the danger which must be assessed, rather than that of the reasonably prudent person, * * * it must also be remembered that this is ordinarily a question to be determined by the jury. That determination is not to be made solely on the basis of the user's own statements but rather upon the jury's assessment of all of the facts established by the evidence. No juror is compelled by the subjective nature of this test to accept a user's testimony that he was unaware of the danger, if, in the light of all the evidence, he could not have been unaware of the hazard * * *; and the factors of the user's age, experience, knowledge and understanding, as well as the obviousness of the defect and the danger it poses, * * * will all be relevant to the jury's determination of the issue, if raised." 45 Ill. 2d 418, 430-31, 261 N.E.2d 305, 312.

■■ As previously noted, the evidence in the case before us established conclusively that not only were plaintiff and Caterpillar's other employees unaware of the danger posed, but defendants' own service engineer did not know that the system was designed so that all switches would drop when one leg was in use. The danger apparently could not be discovered by looking at the control panel or at the machinery itself, or from the maintenance manual. Only by carefully reading the highly technical

electrical sequence manual could a workman discover the hazard. Pipefitters had no reason to be familiar with electrical wiring of the control panel, and the plant safety rule requiring maintenance men to lock out the machine being tended did not apply to this multistation system, according to defendants' witness.

From the record, we conclude that plaintiff did not proceed to use the product in disregard of a known danger when he worked on the switch without locking out the control panel. (See *Sweeney v. Max A. R. Matthews & Co.* (1970), 46 Ill. 2d 64, 264 N.E.2d 170, 171; *Scott v. Dreis & Krump Manufacturing Co.* (1st Dist. 1975), 26 Ill. App. 3d 971, 326 N.E.2d 74, 87.) Under these facts, a jury finding for defendants on this issue could never stand, and the ruling of the trial court was correct.

*Rulings on Evidence*

Defendants also challenge four rulings on evidence during the trial. First, the court overruled defendants' objections when plaintiff's expert witness was asked whether, in his opinion, the system was unreasonably dangerous and not reasonably safe. Defendants argue that it was improper to ask a witness to testify to the ultimate issue and that this testimony improperly infringed on the responsibility of the jury.

■■ We agree with the decision in *Scott v. Dreis & Krump Manufacturing Co.* (1st Dist. 1975), 26 Ill. App. 3d 971, 326 N.E.2d 74, where similar testimony was approved. (See also *Matthews v. Stewart Warner Corp.* (1st Dist. 1974), 20 Ill. App. 3d 470, 314 N.E.2d 683, 689-90.) Defendants asked their engineering experts for an opinion as to whether the system was unreasonably dangerous, so they had an equal opportunity to place expert testimony on this issue before the jury. The trial court did not err in permitting plaintiff's witness to answer.

■■ Second, the court refused to admit in evidence a safety rule of Keystone Steel & Wire Company, plaintiff's previous employer, which stated that the safeguards provided shall be used during maintenance. Defendants argue that the lockout rule is a fundamental precept of maintenance and that Keystone's rule was relevant to the issues of misuse, unreasonable danger, and proximate cause. We agree that fundamental maintenance precepts were relevant, but this does not require the trial court to admit the safety rules of a steel and wire mill, operating in the same community but not associated with plaintiff's employer, where there is no showing that they would apply to multistation machinery in a foundry. Furthermore, there was no showing that plaintiff, who was an apprentice at Keystone, had ever seen the rules. At best, the rules were cumulative of other evidence relating to general safety procedure for Caterpillar. The Keystone rules were properly excluded.

■■ Third, defendants sought to introduce a machine safety checklist from the Accident Prevention Manual of the National Safety Council to

show that the sand delivery system met safety design standards for industrial machines. The trial court held that the only relevant item was the one requiring "fail-safe interlocks" to prevent starting while a machine is being worked on, and the remainder of the list was excluded. Defendants elected to stand on their offer, and now ask that we reverse the trial court in reliance on *Pyatt v. Engel Equipment, Inc.* (3d Dist. 1974), 17 Ill. App. 3d 1070, 309 N.E.2d 225. In *Pyatt*, health and safety rules of the Industrial Commission were held to have been erroneously excluded where plaintiff sought to introduce them for the limited purpose of showing standards of machine design. Unlike *Pyatt*, the trial court here ruled that the relevant item on the checklist was admissible, and excluded only those that were irrelevant to the question of lockout devices. We are not persuaded that the decision of the trial court was erroneous or prejudicial to defendant under the circumstances.

■■ Finally, defendants contend that it was error to exclude an accident report prepared by a Caterpillar investigator which defendants claim was admissible as a business record. Supreme Court Rule 236 (Ill. Rev. Stat. 1975, ch. 110A, par. 236) permits introduction in evidence of any writing or record made as a record of any act, transaction, occurrence, or event if made in the regular course of business within a reasonable time after the event. Police accident reports are expressly excluded. In a product liability case, a report prepared by a metallurgical engineer with a view to use in possible litigation was held inadmissible in *Ocasio-Morales v. Fulton Machine Co.* (1st Dist. 1973), 10 Ill. App. 3d 719, 295 N.E.2d 329, 333-34.

From the record, we note that defendants sought introduction of this report as an admission by Caterpillar that the accident was caused by "Improper practice and procedures." In a conference out of the presence of the jury, defense counsel argued that Caterpillar, although not a party to this suit, had a substantial interest in the litigation because of a $20,000 workmen's compensation lien and that an admission by Caterpillar was binding on plaintiff. A trial court has some discretion when it comes to admitting business records, and he must scrutinize the integrity and probative value of the report. (*Newark Electronics Corp. v. City of Chicago* (1st Dist. 1970), 130 Ill. App. 2d 1021, 264 N.E.2d 868; *Lustig v. Robin* (1st Dist. 1972), 6 Ill. App. 3d 126, 285 N.E.2d 165.) We believe the trial court did not act in abuse of its discretion in refusing to admit the report for the purpose offered.

Accordingly, we affirm the judgment of the Circuit Court of Peoria County.

Affirmed.

STOUDER, P. J., and BARRY, J., concur.