HEWLEE McCORMICK *et al.*, Plaintiffs-Appellants, *v.* BUCYRUS-ERIE COMPANY, Defendant-Appellee.

Third District No. 79-252

Opinion filed February 7, 1980.

James R. Morrison, of Lester Berry Smith, Ltd., of Peoria, for appellants.

Ross E. Morris, of Lewistown, for appellee.

Mr. PRESIDING JUSTICE ALLOY delivered the opinion of the court:

Plaintiffs Hewlee McCormick and Robert Geary appeal from a judgment entered against them, after a jury trial, in a strict liability action against Bucyrus-Erie Company.

The plaintiffs are construction workers who were injured when the boom of a Bucyrus-Erie Super 30-B crane collapsed while lifting a 25-ton load during concrete pier work being done for the proposed new bridge over the Illinois River at Pekin. The plaintiffs' actions against Bucyrus-Erie, the manufacturer of the crane, were premised on strict liability and were based on alleged inadequate warnings and instructions. The jury returned a general verdict in favor of the defendant Bucyrus-Erie and the circuit court entered judgment thereon. On this appeal the plaintiffs raise issues concerning several of the court's evidentiary rulings, its refusal to give a jury instruction on warnings, and alleged improper references by

defense counsel to "collateral sources." Plaintiffs also contend that the court erred in not granting them a new trial, since they asserted they had proven their cases by the manifest weight of the evidence.

The record discloses that in April 1975, S. J. Groves and Sons, a Minneapolis construction company, entered into a joint venture agreement with Midwest Foundation Company of Tremont, Illinois, preparatory to submitting bids for work to be performed on a new bridge crossing over the Illinois River at Pekin. The work to be done consisted of the erection of piers to support the substructure of the bridge. Both Groves and Midwest Foundation were defendants in this lawsuit, but the actions against them had been resolved prior to trial. Groves and Midwest Foundation leased cranes for the pier work from Midwest Equipment Leasing, a sister corporation of Midwest Foundation. Two cranes were brought to the job site near the banks of the Illinois River. At the time of the accident involved in this case, a 2900 Manitowac (60-ton capacity) crane was positioned on the east side (the Pekin side) of the river, and a Bucyrus-Erie Super 30-B was located on the west side of the river.

In the construction of the concrete piers for the substructure of the bridge, Groves utilized huge metal forms which were set on footings, bolted together, and then filled with concrete. The largest of these forms, the face forms, measured 60-64 feet in height, 28 feet in width, and they were 6 to 8 inches thick, in the overall shape of a parabolic curve. The face forms weighed approximately 50,000 pounds. There were two large face forms and two smaller end forms which were assembled together, using the crane, to form the completed pier form. The site of Pier 6 (that involved in the instant case) was approximately 500 to 600 feet west of the river. The pier itself was to have consisted of two stems or individual piers, separated by 35-40 feet but resting on a common footing.

Prior to beginning the work of assembling the forms, it was necessary to add a 20-foot section of boom onto the existing 80 feet of boom in order to accommodate the largest forms. Calculations were also made, by the project manager for Groves, concerning the weight of the forms to be lifted and the lifting capacity of the 30-B with a 100-foot boom. He calculated that the face forms weighed 50,000 pounds and that the 30-B, with 100 feet of boom and an 80-degree boom angle, was capable of lifting 58,000 pounds. In calculating the latter figure, the project manager used information available on a load chart of the 30-B, which chart gave specified lifting capacities at various boom angles and boom lengths. While there was no figure given for a boom angle of 80 degrees and 100 feet, he used the available information and extrapolated from that to reach the 58,000-pound figure. A correct calculation would have indicated that the crane with 100 feet at 80 degrees would have a capacity of only 47,500 pounds. Based upon the calculations he had done, Groves' project

manager concluded that the 30-B could make the lifts of the face forms that were required to be made on the west side of the river. There had been discussions among the management personnel for the joint venturers about the desirability of moving the other crane, the 2900 Manitowac with a 60-ton capacity, over to the west side of the river in order to make the lifts of the heavy forms. It was decided not to bring the larger crane over from the east side of the river, in part because of the high cost and delay ($25,000 and 3 days) involved in such a move. Additionally, calculations suggested that the 30-B, with the added boom, at 80 degrees, could make the required lifts.

When Groves was ready to make the first lift of the large face form weighing 50,000 pounds, it was decided to add additional weight to the rear of the 30-B crane. Addition of such extra weight to the rear would have the effect of preventing the crane from tipping, should it have a lift near its capacity. The rear of the 30-B was tied down to the draw bar of a bulldozer. The crane operator who was on the job site at that time refused to make the lift, feeling that he had too little experience with a lift of that size and weight. Another operator was brought in to make the lift of the large face panel. The lift was made and the face panel was put in place, without serious incident, on the west side of the north pier of Pier 6. Both end panels were also put in place on the north pier. After those lifts had been made, plaintiff Hewlee McCormick, an experienced crane operator and former business agent for the operating engineer's local union, was brought in to make the remaining lifts. Prior to any additional lifts, it was decided by Groves personnel not to use the bulldozer tied to the rear of the crane as it apparently hampered the crane's movement. The crane was a crawler type which ran on tracks. Instead of the bulldozer tied to the back of the crane, Groves personnel added an air hammer, weighing between 8700 and 9500 pounds, to the back of the crane as additional counterweight. The crane carried a manufacturer's counterweight of 30,000 pounds. The effect of using added counterweight, as noted, would be to prevent the crane from tipping when attempting the heavy lift, and thereby the effect would be to allow the crane to make a lift it might not have otherwise been able to make. McCormick knew that adding such counterweight was not good practice, although it was common in the construction industry. Jerome Green, president of Midwest Equipment and Midwest Leasing, disapproved of adding that additional counter-weight and informed a foreman for Groves, but the extra weight was still used. Dennis O'Geary, a vice-president of S. J. Groves and Sons, also testified that the addition of extra counterweight, other than that designed for a specific crane, was a violation of OSHA safety rules.

In July 1975, the large face panel on the west side of the north stem and both end panels of the north stem were already in place. McCormick

and the 30-B then made the lift on the large face panel for the east side of the north stem. That form, with a weight of 50,000 pounds, was lifted to a vertical position and carried by the 30-B a distance of some 200 feet to the footing placement on the north stem. The form was put in place and secured. The form work on the north stem of Pier 6 was thus completed and the concrete was poured. The concrete was allowed several weeks to set up or harden.

In September 1975, Groves began the work of moving the forms from off the north stem, which had been poured, and to the footings erected for the south stem of Pier 6. This required moving them a distance of some 35 to 40 feet in a southerly direction from the north stem. McCormick and the 30-B succeeded in lifting the large face form from the west side of the north stem and moving it south. It was set in place at the south end of the footings for Pier 6. The smaller end forms were then put in place and readied so that the final large face form, on the east side, could be set down in between them. On the afternoon of September 18, 1975, McCormick and Groves were ready to make the lift of the face panel for the east side of the south stem of Pier 6. In order to complete the "pick," as noted, it was necessary for the form to be lifted from the north stem, carried the 35 to 40 feet south, and then placed on the east side (the river side) of the south stem, between the end forms. In order to stabilize the form, a tag line was attached to the south end of the form and Robert Geary held that line. Also in the area of the south stem were guy cables attached to the west side of the form. One of these cables, which was used to hold the in-place forms stable, was attached to the bumper of a pickup truck parked south of the south stem.

McCormick lifted the large face form from the east side of the north stem and he started south with it along the east side of the excavation toward the footing on the south stem. As noted previously, the crane was a crawler type, equipped with tracks. To assure stability, cribbing, in the form of 2-inch-thick planking and 4 by 4 boards, had been placed on the ground over the path that the crane would be traveling. Such cribbing was a standard precaution taken during the lifts of the heavy face forms. When McCormick had the load within a foot or so of its intended destination on the footing, he found it necessary to place the form down on the footing prematurely. There was a conflict in the evidence at trial as to the reasons for this stop and movement. McCormick testified that the stop was made in order to adjust a guy cable near the footing which was in the way of setting the form in place. There was other testimony, from Robert Geary, who was holding the tag line, that the stop was necessitated because the northwest track of the crane had begun sinking into the ground. While Geary could not recall this at trial, his deposition testimony clearly indicated that the crane had sunk, perhaps 6 inches, on

the northwest track and that the stop and maneuvering near the footing was done in order to place additional cribbing under the sinking track of the crane. Geary also admitted that after placing the extra cribbing to prevent track sink, the situation may have gotten worse instead of better.

There was also a conflict in the evidence on the critical matter of the consistency of the soil and the ground conditions in the area of the crane's movements around Pier 6. McCormick and Carl Weir, superintendent for Groves on the project, testified that the ground was firm, dry and hard. Geary's statements that the track sank, maybe six inches, and that extra cribbing was necessary indicate that there was some problem with the firmness of the ground in the area of the lift. Jerome Green, president of Midwest Foundation, one of the joint venturers, testified at trial that he was not aware of any soil problems in the area. However, in his deposition testimony, he indicated that Groves had some problems with the soft soil underneath there, specifically with the soft material underneath the footing of the crane. Green also commented during his deposition that when he visited the site of the accident on the following day, the 19th, the soil was very dry on top, but soft underneath. The photographic evidence offered indicated that the crane had indeed sunk into the ground at its northwest track. It must also be noted that Pier 6 was located only 500 to 600 feet from the river and the crane, on this lift, was on the river side of that pier. Another conflict in the evidence is present on the important question of wind conditions at the time of the lift. McCormick and Weir testified that there was little wind at the time of the lift, while Geary testified that there was some wind, enough so that he felt pressure on the tag line. A chart from the National Climatic Center, showing weather conditions at the nearby Peoria Airport on September 18, indicated that the wind speed at 3 o'clock p.m. was 12 knots and at 6 o'clock p.m. it was 4 knots.

McCormick had the form resting on the footing about a foot or two from its intended destination. After the stop and some wait, either to put additional cribbing in to help the track sink or to adjust the guy cable, the foreman on the project signaled McCormick to hoist the load again. He signaled to McCormick to swing the load to the left, a move necessary to put the load in place. There was a dispute in the evidence as to whether the crane boom ever moved to its left. In any event, shortly after hoisting the load, the boom buckled and collapsed and the 25-ton face form dropped back on the footing. Several seconds later, the form fell over, toward the west, away from the crane. McCormick jumped from the rear of the crane, suffering a knee injury. When the form fell to the west, it pulled the pickup truck, with the guy cable attached to it, into Robert Geary and he suffered leg injuries as well. Vern Halvorsen, project manager for Groves, was notified of the accident and arrived shortly

thereafter. He ordered that the extra counterweight be taken off the crane, indicating that this was done because he felt there would be a lot of people coming there and they would not understand the whole situation (apparently referring to the added counterweight).

Plaintiffs' cause of action was premised upon strict liability and, specifically, upon Bucyrus-Erie's alleged failure to provide adequate instructions and warnings concerning the use of the 30-B crane. They contend that these failures to warn and instruct were the cause of the accident and resulting injuries. Plaintiffs argued that the load chart and capacity plate for the 30-B, which contained lift capacity figures at various angles and boom lengths, should have included a stated maximum capacity for a boom angle of 80 degrees with a length of 100 feet. They argued that the miscalculation based upon the given figures was foreseeable. The plaintiffs also contended that there should have been a warning given against adding extra counterweight. They also argue that the failure to instruct on the crane's "sideload" capacity was a cause of the accident. A "sideload" is a term of art referring, in layman's terms, to any number of factors which can reduce a crane's lifting capacity by creating a parasitic pull from the side of the crane's boom. The optimal lifting position for a crane is on hard level ground, without wind, and with the load directly under the boom sheave. Any force which comes from the side of the boom and which deleteriously affects the optimal lifting conditions is a sideload. Thus, swinging the crane from side to side or traveling with the crane on its tracks creates sideloads which reduce the lifting capacity of the crane. Any amount of wind can cause some sideloading, as can operating the crane on anything but level ground. Track sink, to the extent it puts the crane off level, creates a sideload parasitic of lifting capacity. It is to be noted that both the capacity plate in the crane and the load chart specifically stated that the ratings given applied only to machines on a hard level uniform supporting surface. It was also stated both places that "proper care must be exercised by the operator at all times to avoid shock or sideloading on the boom."

The defense position at trial was that the crane was fully capable of making the lift of the 25-ton face form, if the lift had been made according to instructions and common practice. They argued that the collapse of the boom was not caused by their failure to instruct as to capacity or to warn against counterweight or sideloading, but that the cause of the accident was the misuse of the crane in attempting to lift the heavy load given the conditions at the site on the day of the lift. After hearing the evidence, arguments of counsel, and instructions from the court, the jury retired and then returned a verdict for the defendant Bucyrus-Erie. From judgment on that verdict the plaintiffs appeal.

■■■ The first issue raised by plaintiffs is whether the court erred in not

granting them a new trial, since, they allege, liability was proven by the manifest weight of the evidence. Related to this issue is another raised by plaintiffs, in which it is asserted that the evidence does not support a finding of misuse of the crane as the cause of the accident. We recognize that it is established that a manufacturer must give both adequate directions for use and adequate warnings against potential dangers in the use of its product. (*Neal v. Whirl Air Flow Corp.* (1976), 43 Ill. App. 3d 266, 272, 356 N.E.2d 1156.) The duty arises where there is unequal knowledge and the defendant, possessed of such knowledge, knows or should know that harm might occur if no warning is given. (*Neal v. Whirl Air Flow Corp.* (1976), 43 Ill. App. 3d 266, 272, quoting from *Williams v. Brown Manufacturing Co.* (1968), 93 Ill. App. 2d 334, 236 N.E.2d 125.) The questions before us are (1) whether the manifest weight of the evidence established that there was a foreseeable danger present, without the suggested instructions and warnings, such that the crane was unreasonably dangerous and (2) whether the failure to include such instructions and warnings caused the accident.

 The defense raised a question of misuse, an accepted defense to a strict liability action. (*Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, 431, 261 N.E.2d 305.) As stated in *Gallee v. Sears, Roebuck & Co.* (1978), 58 Ill. App. 3d 501, 503, 374 N.E.2d 831, 834:

> "The misuse of a product which will constitute a bar to an action predicated upon strict liability in tort has been objectively defined as a use for a purpose neither intended nor reasonably foreseeable by the manufacturer. [Citation.] The issue of misuse, therefore, arises 'in connection with plaintiff's proof of an unreasonably dangerous condition or in proximate causation or both.' *Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, 431."

It is established that the question is usually one of fact for the jury. (45 Ill. 2d 418, 431.) We would note, additionally, that both misuse by a plaintiff, the more usual case, and misuse by a third party can defeat a strict liability action. This is so where it is found that it was such misuse of the product, and not any dangerous condition of the product, which caused the injuries to a plaintiff. In such situation, the remaining question is whether the misuse of the product was reasonably foreseeable by the manufacturer. That, as a part of the overall question of misuse, is for the jury to determine.

██ We find that the question of misuse is dispositive of the questions raised concerning the verdict reached and the failure of the court to order a new trial. We find sufficient evidence in the record to support a jury finding that it was an unforeseeable misuse of the crane by plaintiff McCormick and contractor S. J. Groves which caused the accident and resulting injuries to McCormick and Geary. That evidence of misuse was

the operation of the crane, with added counterweight, to lift a load believed by construction personnel to be near the crane's lift capacity, on a surface which they knew or had reason to know was not firm, solid ground, and in wind conditions unfavorable to such a lift. Expert testimony indicated that the combination of those factors could and likely did cause an excessive sideload sufficient to cause the buckling of the crane boom. There is no real dispute in the record among the parties who recognize that sideloading caused the accident. While the evidence in the record is conflicting upon many of the factual matters relating to the question of misuse, determinations of credibility and weight are for the factfinders.

The plaintiffs argue that any misuse which may have occurred was foreseeable and that its foreseeability was shown by the manifest weight of the evidence. Foreseeability, as noted, was also a question of fact for the jury, and we find the evidence sufficient to support a finding that the misuse herein involved was not reasonably foreseeable by the manufacturer. Plaintiffs' arguments are addressed to both the addition of extra counterweight and the factors causing the excessive sideloading. They argue that it is a common practice in the industry to add extra counterweight and that, therefore, that aspect of misuse is foreseeable to the manufacturer and should be warned against by it. While it may be conceded that the evidence indicated that the use of additional counterweight above factory specifications is not unusual in the construction field, there is little doubt, in the instant case, that any such warning against its use would have had little, if any, effect upon the decision to add the counterweight. McCormick testified that he knew that it was not a good practice to add extra counterweight. He was an experienced operator and was aware that by adding counterweight to the crane he would be deprived of a cautionary device, tipping with too heavy a load, designed to inform him, as the operator, when the crane was being asked to lift beyond its capacity. In addition, Jerome Green testified that he told S. J. Groves personnel that the extra weight should be removed. A Groves vice-president indicated that he knew that there was an OSHA regulation against the addition of any extra counterweight.

■■ Under the facts, as supported in the record, it is apparent that a warning by the manufacturer would have done little to prevent the contractor from adding the weight and McCormick from operating the crane with the additional counterweight. In addition, the record indicates that there was no unequal knowledge as to the broad, unfavorable consequences of adding such weight. As to plaintiffs' arguments concerning the foreseeability of the sideloading misuse, apparently the jury was not convinced. It is established that some sideloading is inevitable outside of perfect laboratory conditions or computer

programs. To that extent then, sideloading is foreseeable. In the field, some sideloading will always occur. However, the jury could have concluded on the evidence that it was not foreseeable to Bucyrus-Erie that the crane would be operated with the high degree of sideloading that was caused by the operation of the crane in the instant case. There was sideload created by the movement of the crane, the wind conditions, and most significantly, by operation of the crane on ground that was soft and spongy underneath. The evidence is capable of supporting a jury determination that such operation of the crane, with that excessive sideloading, was not reasonably foreseeable to the manufacturer. Additionally, we again note that there was an express cautionary warning in the crane and in the load chart that care should be taken to avoid sideloadings and to keep the crane level, standing on a hard, level, uniform surface. Plaintiffs' suggestion that some sort of formula for calculating exact sideloads ought to have been included is unsound, given the largely unquantifiable variables affecting sideload on any given job at any given time. Having now concluded that the verdict was supported by the evidence, we turn to other issues raised by plaintiffs.

■▌ The plaintiffs assert as error the court's refusal to allow Vern Halvorsen, the project manager for Groves, and Carl Weir, the superintendent, from giving their opinions on the effect, if any, of adding additional counterweight in relation to the boom's collapse. Weir was experienced in the construction business and Halvorsen was a civil engineer who had worked with cranes for over 23 years. On the basis of their backgrounds alone, plaintiffs claim these men were qualified to give their opinion on the relationship between extra counterweight and boom stress and collapse. So far as appears in the record, the question calls for a somewhat technical answer based upon some study and analysis of the specific variables involved. Neither man was shown to possess qualifications in the area of the mechanics of boom construction and design. Neither man had made any calculations, done any studies, nor made any analysis whatsoever on the relationship between extra counterweight and boom strength and stress. No sufficient foundation was laid establishing that these men were qualified to give their opinions on the question asked. The defense expert, a professor of mechanical and aerospace engineering at IIT in Chicago, and a specialist in the field of the safety of mechanical devices and systems, had done extensive force, stress and strength analyses of the 30-B boom which established a foundation for his opinion as to the causes of the accident. While Weir and Halvorsen, by virtue of their experience, were competent to testify as to the uses of cranes and the practices in the field and such related matters, they were not shown to be qualified experts on the physics of boom design and stress. Since a sufficient foundation had not been established

for them to offer their opinions on the question asked, the court was within its discretion in disallowing their testimony on that question.

■■ The plaintiffs next claim that there was error in excluding the evidence that a new version of the 30-B crane, the Series 4 version, carries a factory counterweight of 35,100 pounds, some 5,000 pounds above that carried by the 30-B, Series 3, involved in the instant case. The plaintiffs sought to use this fact to show subsequent product modification, going to the question of misuse by adding additional counterweight. The court rejected the evidence because of the differences between the Series 3, 30-B, and the Series 4, 30-B. While subsequent product modification is admissible at times in a products liability case (*Cunningham v. Yazoo Manufacturing Co.* (1976), 39 Ill. App. 3d 498, 350 N.E.2d 514), the trial judge acted within his discretion in excluding the evidence because of the differences between the cranes. According to the record, the later model 30-B had a greater lift capacity, by 10 tons, than the Series 3, 30-B, apparently as a result of design features and construction different from that utilized in the Series 3 model. That the Series 4 is the most similar model does not require admission of the evidence, where significant differences are shown to exist. There was no error in the court's refusal to admit evidence of subsequent product design.

■■ The next error alleged to have been committed by the court was its decision to call Jerome Green, Dennis O'Geary, and James Gilles as court's witnesses. Green was president and principal stockholder in Midwest Foundation and Midwest Leasing, a defendant in the original suit. O'Geary was a vice-president of S. J. Groves, another defendant in the original suit. Gilles was vice-president of Midwest Foundation. The court's decision to call these men as its own witnesses was a result of the fact that shortly prior to trial, Groves and Midwest Foundation, joint venturers on the job and defendants in the suit, entered into an agreement with plaintiff McCormick. They, or their insurers, agreed to waive their rights to recover workmen's compensation benefits paid and also agreed to loan McCormick a certain sum of money (alleged to be $100,000), repayable only out of any recovery McCormick might receive against Bucyrus-Erie and Bethlehem Steel, the then remaining defendants in the lawsuit. Thus, it is established that the joint venturers stood to profit financially if the plaintiff McCormick recovered a judgment against Bucyrus-Erie. Under the circumstances, defense counsel did not wish to be bound by the testimony of these witnesses since the companies for which they worked had a financial interest in the outcome of the litigation, which interest was contrary to that of Bucyrus-Erie. The court, seeking to accommodate the concerns of the defense, decided to call the men as court's witnesses and to allow each party to cross-examine them and not be bound by their testimony. Plaintiffs assert that the court's

actions were in error since the witnesses were not shown to have been hostile or untruthful, and thereby, there was no foundation laid for calling them as court's witnesses. It has been established that the practice of calling a witness as a court's witness should be used sparingly, if at all, especially in jury trials. (*Crespo v. John Hancock Mutual Life Insurance Co.* (1976), 41 Ill. App. 3d 506, 518, 354 N.E.2d 381.) With respect to Gilles and O'Geary, we find no sufficient foundation established for calling them as court's witnesses. They were not shown to be hostile or untruthful, and they were merely officers in the corporations which had a financial stake in the outcome. However, plaintiffs have shown no significant prejudice, requiring reversal, with regard to their testimony. As to Jerome Green, we cannot say that the use of the court witness rule was an abuse of the trial court's customary evidentiary discretion. Green was not only president of Midwest Foundation, but he was also principal stockholder. He, more than Gilles or O'Geary, had a direct financial interest in the outcome of the cases, which interest was best served if a verdict against Bucyrus-Erie was returned. While not intending to encourage the practice, which, as noted, should be used sparingly, under the circumstances herein present, we find no error in the court's decision to call Green as its own witness and to permit cross-examination by both parties. We would add that the alleged prejudice, admission of Green's deposition statements indicating the spongy condition of the ground, would not require reversal, given that those conditions were established in the record by the photographs and the testimony of plaintiff Geary. There was no prejudice sufficient to require reversal even if the court would be found to have erred in permitting him to testify as a court's witness.

■■ The next assigned error is the refusal of the court to tender the jury instruction submitted by plaintiffs on warnings and instructions. It stated:

"When I use the term 'conditions' in these instructions, that term includes not only the physical aspects of the product, but also warnings and instructions.

Whether a particular warning or instruction is required under the facts and circumstances of this case is for you to decide."

We find no error in the court's decision on the use of the instruction. It is a non-IPI instruction, and it covers an area where the IPI committee recommended that no instruction be given (Illinois Pattern Jury Instructions, Civil, No. 400.07 (1977 Supp.)). The issues instruction given by the court adequately covered plaintiffs' position with respect to instructions and warnings and that basis of their action. Also, with respect to claimed prejudice, a review of the record indicates that counsel repeatedly and without objection emphasized the substance of the refused instruction in his argument to the jury. We find that the jury was adequately

instructed in this case and that there was no error requiring reversal in the court's decision to refuse this tendered instruction.

■■ Another asserted error is the court's allowance into evidence of the fact that OSHA rules prohibit the use of extra counterweight above that which comes from the manufacturer. Plaintiffs argue that such evidence ought not to have been allowed in, since neither plaintiff was shown to have been aware of the rule. We disagree. The admission into evidence of the substance of the OSHA regulation was relevant to the question of misuse on the part of S. J. Groves, the contractor. We have previously noted that misuse by a third party, which *causes* the accident, acts to bar recovery against the defendant. In this case, the defense attempted to show misuse of the crane by both plaintiff McCormick and S. J. Groves caused the accident. The admission by a Groves vice-president that he was aware of a regulation against adding extra counterweight is relevant and admissible to the question of misuse by Groves. We find no error in the testimony elicited concerning OSHA regulations on adding extra counterweight.

A final issue is raised as to whether there was reversible error in certain defense questions and comments allegedly referring to collateral sources. We have reviewed the record with regard to those references and comments and find no reversible error. We find plaintiffs' suggested implications and interpretations of defense statements and comments to be largely strained or unfounded. With regard to the obviously improper questions concerning the bills, the questions were objected to and objections sustained, and the court was in the best position to assess the impact and intention of those questions. We find no error sufficient to require a reversal.

The decision of the Circuit Court of Peoria County is affirmed.

Affirmed.

STOUDER and STENGEL, JJ., concur.